# SUPREME COURT OF MISSOURI,

## SECOND JUDICIAL DISTRICT, AUG. TERM, 1835.

.THE STATE TO THE USE OF GENTRY & WIFE

v.

FRY & OTHERS.

1. Action of debt by Gentry and wife (in the name of the State) against .Fry as guardian of Elvira Fry the wife of Gentry and his securities on their bond—marriage alleged since the bond was made—Breach that Fry had received large sums of money as such Guardian &c.—plea, that by an act of the general assembly of Mo., Gentry and his said wife were divoced from the bonds of matrimony—Demurrer to plea and joinder—Judg't. for defds.—and writ of error.
2. Opinion of Judge McGirk—The act of the General Assembly granting the divorce is unconstitutional—and the plea bad.
3. Opinion of Judge Tompkins—The act of the General Assembly is unconstitutional; and the plea bad.

WRIT of error to the circuit court of Marion county.

Opinion of Judge McGIRK.*

This was an action of debt brought in the name of the State to the use of Gentry and wife, against Fry as the Guardian of Elvira Fry, the wife of Gentry and also against the securities. Since the bond was made the marriage took place—several breaches were assigned on the condition of the bond, alleging that Fry had received large sums of money belonging to the minor Elvira, and had failed to pay the same over.

To this action the defendants pleaded that on the —— day of February 1833, the said Elvira was by an act of the general assembly of the State of Missouri divorced from the bonds of matrimony subsisting theretofore between her and Gentry.

To this plea the plaintiff demurred, the court overruled the demurrer and gave judgment for the defendants. This case involves the question whether or not the legis-

Action of debt by Gentry and wife (in the name of the state) against Fry as Guardian of Elvira Fry the wife of Gentry & his securities on their bond—marriage alleged since the bond was made— Breach that Fry had received large sums of money as such Guardian &c. plea, that by an act of the general assemby of Mo., Gentry & his said wife were divorced from the bonds of matrimony—Demurrer to_

---

*Wash Judge, being absent.

AUG. TERM
1835.

The State
v.
Fry & others.

plea and joinder—
Judgment for
defds.—and writ
of error.

Argument of plffs.
counsel (incorpo-
rated by the judge
into his opinion)

latute can constitutionally pass an act divorcing a man and his wife from the obligations and duties taken on them by entering into marriage. To sustain the position that the act is unconstitutional Mr. Chambers argues as follows:

"In the former argument of this case the counsel for the plaintiff made four points for the consideration of the court. The same are now insisted upon. The first position is that marriage is such a contract as was contemplated by the framers of the constitution of the United States and of this State. The term, *marriage*, as used in our language is borrowed from the French words *marrier*, signifying to marry—and *mari* a husband, and is defined to mean by commentators, "a civil and religious contract whereby a man is joined and united to a woman for the purpose of civilized society." The latin word *maritagium* which corresponded with the term marriage in the English was likewise used under the feudal system to denote the giving of a ward or widow in marriage, and the portion and lands which the husband took by the marriage. Before entering into a minute investigation of this contract as it has been treated and considered by writers on the civil and common laws—it may not be unprofitable to examine the light in which it has been held by other nations than those from whom we borrow our laws. This institution as a civil regulation or contract was first introduced by Cecrops, King of the Athenians, into Greece, and after his reign down to the end of the Commonwealths, it continued to be regarded in the light of a contract and laws were made to enforce and protect it, as also the rights of the parties under it. The age at which the parties should marry—the form in which it should be solemnezed—and the time of the year when consummated was all regulated by law.

Among the nations less civilized the customs are various; but through all, the evidence is plain, that it is esteemed a contract. Thus, in Turkey and the Ottoman Empire a man may have three sorts of wives, and but one woman of the first class. The first is called legitimate, and is made by the mutual consent of the parties and the sanction of the parents of the female. The second, *wives in kebin*, are hired wives, which may be repudiated upon the expiration of the term of time, and thirdly—*slaves*—these are bought. In Russia the lover goes to the house of the bride's mother and says, "show me your merchandize I have got money," and if both agree and the parents are satisfied with the husbands presents, the marriage is

immediately confirmed. Among the Persians the Abipo-mions, the Chinese, the Hebrews, the Assyrians, the inhabitants of Sumatra, and most of the savage nations of Asia, Africa and America, the wife is purchased by the husband, either at a stated price, or by presents. Yet in all these nations, there are laws or customs for the regulation of the contract and defining the reciprocal duties of the husband and wife.

There is also one fact, which attends this contract wherever it exists—and that is, that upon the marriage, the wife and all of her property passes *in potestatum viri*, into the power and disposal of the husband. The husband immediately upon the celebration of the marriage becomes possessed of the absolute control of the person and effects of the woman, and the laws or customs of all countries furnish him the right to enforce and exercise his just authority over them. In the barbarous and semibarbarous nations, his right over the person of the wife is more extensive than in the more civilized, but not more certain and defined, than in our own country. These facts are brought to the recollection of the court, only for the purpose of shewing that in all nations and tribes of which history furnishes us any evidence of their laws or customs, the institution of marriage is esteemed and considered as a matter of trade or barter; as a contract highly municipal in the consequences which follow and are attached to it, but not the less a contract between the contracting parties, whether these be the husband and wife alone, or the husband on the one part and the parents or Guardians on the other, or as it exists amongst the Persians by the intervention of females on behalf of the husband and the parents on the part of the wife.

Every people esteem it binding trade and furnish the injured party a remedy against the offending party for the reparation of the injury and the enforcement of his or her duty.

Those to whom we refer for the first principles of our system of civil jurisprudence, have but done and held this contract as all other nations have esteemed it, until the time of Pope Innocent III, the ceremony was looked upon as exclusively a civil contract. There was no solemnization of marriage in the church, *facie eclesiæ*—but the man came to the house where the woman inhabited and led her home to his own house, which was the ceremony then used. Pope Innocent the III, gave to the ceremony the character of a divine institution, and elevated it to the dignity of one of the holy ordinances of God, and

1 Rol. Abr. 359, 1 Sid. 64.

16

AUG. TERM
1835.

The State
v.
Fry & others.

Reeves—Dom.
Rela. 176.

requiring the sanction of the church for its validity. Since then it has been held by many denominations, and at this day, is by some both Protestant and Catholic, viewed as a sacred ordinance, or religious contract, requiring the presence of one authorised to administer the sacrament, at its celebration. It is in no wise necessary for our present purpose to pause to enquire into the nature of the sacred character which the act of Pope Innocent has thrown around this ceremony, for as will hereafter be shown, this elevation of the institution has not in any wise changed or varied the character ascribed to it by the civil law. It is however, worthy of observation that even amongst *canonists* the investment of the marriage ceremony with this additional sanctity of character did not change or vary their understanding of its obligations and attendant circumstances between the contracting parties. These still continued to hold it as a contract of divine creation, requiring the consent of the parties before it had any binding efficacy and that once given though not in the form prescribed by the church, rendered it valid and operative. From the act of Pope Innocent has flown that portion of the definition of the term *marriage* which commentators have given to it, and which we have quoted above, viz: "religious contract."

Almost every commentator on civil law, prior to the time of Sir William Blackstone has invested it with the double character of a civil and religious contract, but no one has at any time treated it as less a civil contract, because of this double character.

I now come to the consideration of the question, whether marriage was such a contract as was contemplated by the framers of the United States, and State constitutions; and first I ask leave to show what the term contract in its legal sense embraces. It has been urged that there are two meanings that may be attached to this term, but that as used by the framers of the constitution, it could only have been intended to embrace contracts of a pecuniary obligation. It is a sufficient reply to this argument to say that the term contract has but one legal and technical definition, and that it does not extend so far as to affect the political relations which exist between the government and its citizens, when these relations are of purely a political character. Certain it is that there are many relations between the citizen and the government, which are, and many others which are not embraced within the legal and political operation of this term. The right of an individual to an office if the tenure is by the

pleasure of the appointing power, ceases upon the order of that power, properly expressed, and he cannot longer hold it. If it is an office which the legislature may destroy or vacate, and they do destroy the office, the original undertaking, that he should hold it for a given time will not enable him to do so after the destruction of the office; for this is purely a political regulation, and the contract ceases to bind when the office is destroyed.

The same argument will apply to many other conditions and regulations between the state and citizens. But there are likewise many other instances in which the rule operates to bind the contract between a state and its citizens, as between any other two contracting parties. In every instance where the transaction can be brought within the technical definition of a contract, there I apprehend the term will apply in the sense understood by the framers of the constitution, and all instances coming within that definition the courts will be bound to so construe as to protect them by that instrument.

Writers on general law define the term *contract* to be "Duorum pluriumve in idem placitum consensus obligationis licite constituendae vel tollendae causa datus. "That is, where the consent of two or more persons in the same thing, is given with the intention of constituting or dissolving some lawful obligation." Mr. Powell with much perspicuity defines it to be "a transaction in which each party comes under an obligation to the other, and each reciprocally acquires a right to what is promised by the other." Jacobs says "it is a covenant or agreement between two or more persons, with a lawful consideration or cause." Pothier defines it to be, "the consent of two or more persons to perform some engagement or to receive or modify an engagement already made."

Chief Justice Marshall defines a contract to be "a compact between two or more parties."

A number of additional definitions of this term are to be found and might be cited, but the above are sufficient to prove that the term has a legal and definite technical meaning, which was understood and adopted by the framers of the United States and the state constitution. The definitions above given have been adopted by the U. S. Supreme Court and acted upon by them. Judge Washington in his opinion in the Dartmouth college case, adopts the language of Mr Powell as being the sense of the term as used in the constitution. It is but a fair and reasonable inference, that the able author of the 44th member of the Federalist, understood it in the sense of the above

AUG. TERM 1835.

The State
v.
Fry & others.

Powel on contracts 6.

Jacobs Dic. con.

Pothier on obligation 3. U. S. con. Rep. 321.

U. S. con. Rep. 555.

AUG. TERM
1835.

The State
v.
Fry & others.

Federalist No. 44.

Rawle on the con·
sti. 136-7.

Story's com. on
the consti. 507,
sec. 707.

definitions, and if a proper attention is bestowed to his language, it will prove that my hypothesis does not do injustice to the assertion that he so understood it. His language, treating of bills of attainder, *ex post facto* laws and laws impairing the obligation of contracts is, "The two former are expressly prohibited by the declarations prefixed to some of the state constitutions and all of them are prohibited by the spirit and scope of these fundamental charters.

Our own experience has taught us nevertheless that additional fences against these dangers ought not to be omitted. Very properly, therefore, have the convention added this constitutional bulwark in favor of personal security and private right."

These authorities and the language of the last quotation prove most conclusively, that the term contract as used in the constitution, embraced not only *contracts of a pecuniary obligation,* but "every executed agreement, whether between individuals or between individuals and a state, by which a right is vested, and every executory agreement which confers a right of action or creates a binding obligation in relation to subjects of a valuable nature, such as may be asserted in a court of justice."

This is the definition as received and acted upon by the highest judiciary of the Union and recognized by the able commentators on the constitution. Judge Story uses this lucid and emphatic language; speaking of the term contract, he says, "It has always been understood that the contracts spoken of in the constitution, were those which respect property or some other objects of value, and which are capable of being asserted in a court of justice."

It is therefore not essential that the contract should be exclusively of a pecuniary character, if it has created a vested right, or if it has given the right of action, or has created an obligation which a court of justice may enforce, then is it within the provision of the constitution and protected by it. The opinion and ·expressions of C. J. Marshall in the Dartmouth college case, does not in the least militate against the correctness of this counclusion. For in that case, he adopts the definition given by Justice Story, and although he illustrates the exceptions to the definition by the case of the general rights of the legislature to legislate on the subject of divorce—"yet I do not understand him as at all withdrawing any thing from the force of the position I have assumed from this case. The right of the legislature to pass general laws

concerning divorces, has never, that I know of, been denied, nor is it now questioned, it is only their right to pass special laws for special cases, that their power is disputed and that question is not touched by the judges opinion now under consideration. As it has not been urged in the argument, I therefore deem it unnecessary to detain the court upon the distinction attempted to be drawn between the *contract* and the *obligation* of the contract. Believing that I have established by the current of authorities, what is the true definition of the expression used by the constitution, I shall next proceed to show that *marriage is a contract and is embraced within that definition.*

Blackstone says, "our law considers marriage in no other light than as a civil contract. * * * * And taking it in this civil light the law treats it as it does all other contracts, allowing it to be good and valid in all cases where the parties at the time of making it, were in the first place willing to contract—secondly, able to contract, and lastly, actually did contract in the proper forms and solemnities required by law."

Bacon says, "marriage is a compact between a man and a woman for the procreation and education of children." He also borrows Swinburn's definition of the manner in which it must be solemnized.

Chancellor Kent defines it to be a contract *jure gentium* and consent is all that is necessary.

Reeves in his Domestic relations, says, "It is a mere civil transaction to be solemnized in such manner as the legislature may direct."

Hoffman in his legal outline, adopts the definition of Rutherford, who defines marriage to be, "a contract between a man and a woman, in which, by their mutual consent, each acquires a right in the person of the other for the purpose of their mutual happiness, and for the production and education of children."

Many other authorities might be cited but these I presume will suffice to prove, that marriage has always by the commentators on civil law and also by the courts, been held and considered in the light of a civil contract. If then the conclusion be true, that it has heretofore been at all times by commentators and by the courts, regarded as a civil contract, on what ground can the argument rest that it was not so regarded by the framers of the constitution? It, at the time of framing that instrument, and for centuries before, had been treated as a contract, possessing all the attributes of other civil contracts, in its formation—conferring rights in themselves valuable and

*Margin notes:*

AUG. TERM 1835.

The State v. Fry & others.

Black. com. 433.

Bac. Abr. 523, 530.

2 Kent 75.

Reeves Dom. Relat. 196.

Hoff. legal outlines 148.

1 Ruth. Inst. 214.

capable of being enforced in a court of Justice—and with this understanding of the manner in which it was regarded by jurists, the constitution was framed by individuals fully apprised of the fact—and can it now be supposed that it was not so understood, or that they intended to exclude it from the protection of the constitution.

Marriage has always been held in law a valuable consideration, on which to predicate a contract either between the husband and wife or third persons—it is founded upon the consent of the contracting parties—it gives vested rights, both to the persons and property of each of the contracting parties—and why then when it possesses all these ingredients of the definition of the term contract before given, shall it be said not to be embraced within its provisions or spirit. But if there existed any doubt upon general principles, whether marriage was a contract within the spirit and meaning of the constitution—that doubt, I think is removed by the opinion of Justice Story in the Dartmouth college case.

U. S. con. Rep. 576.

Of this contract he says, "As to the case of the contract of marriage which the argument supposes not to be within the reach of the prohibitory clause, because it is a matter of civil institution, I profess not to feel the weight of the reason. In a legal sense all contracts recognized as valid in any country may be properly said to be matters of civil institution, since they obtain their obligation and construction jure loci constructus." This doctrine has again been taken up and acceded to by Chancellor Kent in his commentaries, and has been generally received as settling the question.

1 Kent com. 391.

To obviate the force of the authorities and decisions which treat marriage as a civil contract two resources are drawn upon. First, it is said that marriage is not a contract but a civil relation and that the term contract has been used from its comprehensive signification and to distinguish it from a religious institution. The term contract could not have been adopted by legal writers, from a wish to distinguish it from a religious institution—for prior to the association of the institution with the religion of the country, it was thus defined, and at that time was treated purely as such. After the reformation it was again so considered by jurists and by the prelates of the Episcopal church of England, and only by common consent were they permitted to assist in its solemnization. During the existence of the Commonwealth, it was exclusively solemnized by the justices of the peace. If on the other hand it was adopted from the comprehensiveness

AUG. TERM
1835.

The State
v.
Fry & others.

of the term contract, then does that fact prove its aptness and fitness to express the idea intended to be conveyed. I am not aware that it is in any view of the case under consideration, necessary for me to controvert the assumption that marriage is a civil relation affected by climate, area of country and other causes. Neither do I feel called upon to oppose the doctrine, that it should be under the control of the municipal law of the land. Whether it be a contract or a relation, it certainly is of so extended a character—embraces so large a portion of the whole people of a government, and enters so extensively into the morals, manners and regulations of society, that it is very properly made one of the special objects of legislative attention and care.

But this admission by no means concedes, that individual rights accruing under it, can with more facility be impaired or destroyed.

Secondly, it is said that marriage is not a contract but a civil relation, the incidents of which, are so highly municipal in their character, that it ought to vary with the varying condition of the country and people, and be entirely subject to the municipal law.

To prove it not a contract, but a relation of the above character, its incidents are referred to and its peculiar qualities recited. It is admitted that marriage as a contract has many incidents, conditions and attendant circumstances, which prominently distinguish it from every other contract. Many of these incidents, conditions and regulations are such as the positive laws of the land have superadded for the wholesome regulation of society to the laws of nature and morality; but all these peculiarities I contend do in no wise detract from its character of a contract. Every contract has attached to it many incidents peculiar to itself, and not found in any other contract not of the same class or species, yet every contract of whatever class, species or kind it may be, must possess those principal distinguishing features which run through all contracts, and whenever it does possess these, it is entitled to the appellation and consideration of a contract, notwithstanding the peculiarities of the incidents which may be attached to either the persons who are the contracting parties, the consideration moving to the contract, the particular form required by law, of entering into it—the indissolubility of it after having been entered into—the rights and duties which flow from its consummation, or any condition resulting to the surviving party after the contract is at an end. These, however varied they

may be (and there are as many varieties as there are kinds of contracts) cannot make a transaction, which has an expressed *consent* between two persons, able to give that consent for its foundation and a valuable consideration moving between the same parties, less a contract, than if they were not attached to it, or did not make a part of it. Hence I infer, that although the contract of marriage can only be made between a man and a woman, has the affections of the heart and the mutual happiness of each for its consideration—although upon being entered into, each acquires a right to the person of the other—requires particular forms for its solemnization—*is indissoluble by* the consent of the parties—has for its end the procreation and education of children. Although the legal existence of the wife becomes during coverture merged in that of the husband, she acquires her right of dower in his estate after his death, and he becomes possessed of her estate and property with an absolute or limited estate. These are but incidents which the condition of mankind and the welfare of society have imposed, and do no more detract from the purity of this contract than do similar or dissimilar incidents in any other contract, where a like necessity exists.

In the United States the question has never that I know of, been judicially settled, how far the *lex loci contractus*, governs the marriage contract, nor in what cases the *lex domicilii* should prevail; to determine the validity of the marriage contract, the lex loci contractus has prevailed by the operation of the *jus gentium* and although this latitude is repugnant to the general principles of law relating to other contracts, yet this innovation has been admitted from policy and the comity of nations, by common consent and general adoption. As to the validity of divorces granted by a foreign court, to citizens of this state, or as to causes of divorce between persons not contracting within this state, they remain yet undetermined in the United States, and the current of English, Scotch and French decisions varying on this question. The English courts have gone far towards sustaining the *lex loci*, whilst the current of decisions in many of the State courts would seem to admit that the states in which the parties have become domiciled, have the power of adjudication on the violation of the contract. However the question may ultimately be determined as to lex loci and the lex domicilii, in relation to the validity of divorces, it cannot operate now to prove that marriage is less a contract. For as said by the

2 Kent com. 79,
16 Mass. Rep. 157,
2 Hayward 412 16.

2 *Kent com.* 91.
1 Johns. Rep. 424.
14 Mass. Rep. 227.
4 Con. R. 380.
1 N. H. Rep. 242.

4 U. S. con. Rep.
5.

court in the Dartmouth college case, the general laws of a state in relation to divorces are not impairing the obligation of a contract but a means of enforcing it.

Another fact which renders marriage a highly municipal contract is, that it is in part executed and partly executory until the death of one of the parties, and upon this ground the lex domicilii is justified in prescribing conditions and incidents, which it would not in any other case. I am not prepared to admit the power of the legislature to change the law, so as to affect the lex loci of prior marriages;—but should it be conceded, it will only be conceding power to the legislature to enforce this contract by releasing the unoffending party from an obligation which has ceased to be binding because not mutually observed. As to the illustration of the dower interest of the wife in the property of the husband, and of the courtesy of the husband in the lands of the wife—these and the statute of descents and distributions are doubtless subject to the control of the legislature of the State where the property is, and not where the parties are domiciled: yet when the legislature alter, vary, or change these, they do in no wise affect a perfect right or choate right of either party. For instance the woman's right of dower in her husband's property is contingent, and that contingent right depends upon two other contingencies, which are, first, that she shall survive her husband, and secondly, that the law of the land where the property is at the time of the husband's death will allow her dower. Therefore, when the contract is made the agreement of the parties is not, that the wife shall have one third of her husband's lands during her natural life, and one third of his personal property absolutely; but that she shall have so much of each as the law of the State where the property is may allow her at the time of her husband's death. The fact that marriage is a contract by the jus gentium sustains this interpretation of the minds of the parties at the time of entering into the contract and the extent to which the lex loci forms a part of it. The same reason may extend to causes for a divorce, declared to be causes by the legislature, after the marriage is consummated. I have shown what in my understanding of the law, is conclusive, that marriage is a contract and protected by the constitution. I shall now enquire into the second clause of the first point made, and that is, that there are vested rights under and by virtue of the marriage contract, which are protected by the constitution and laws of the land.

17

2 Kent's com. 109.
Claucy's rights of
women 91 and fol-
low:

Jacob Dic. 4, all
the law dower.

Reeves Dom. rela-
3rd.

6 John. Rep. 112.

Butler's note to
Coke on Littl. 304.
Claucy's rights of
woman 12.

4 Bac. 426; 5 T.
R. 89. 1 Bur. 542.
Jacob Dic. Barron
B. Straug.  478-
875.

F. N. B. 80.

I feel relieved from the necessity of quoting many authorities upon this branch of this division, for as I understand the argument, it is not denied that it does confer and create vested rights, but that in the case at bar, the act pleaded does not take from the plaintiff any such vested right. With a view to examine this point the authorities are chiefly cited.

The general rule upon this subject is that the husband becomes entitled upon the marriage to all the goods and chattles of the wife, and to the rents and profits of her lands, and he becomes liable to pay her debts and perform her contracts. Of her real estate, where the feme is seized of an estate of inheritance, he becomes seized of a freehold interest, jure uxoris, and takes the rents and profits during their joint lives, and the same is the operation of estates in fee tail. Upon the marriage her chattles real, pass absolutely to the husband and he may sell, assign, release, or dispose of them in any manner that he pleases. Her choses in action, that is debts due her, by bond or contract, her right to damages for injuries, personal property not in her possession, but for which she may have her action, her portion as heir or legatee to an estate, he takes a property in. "He may absolutely dispose of them at pleasure. He may sue and collect them in his own name, or in the name of his wife, and when collected, the avails are absolutely his." If the husband survives the wife, he is entitled to her choses in action as well as to her personal estate in possession, and he is thus entitled whether they are actually vested in her and reduced to possession, or contingent and recoverable only by action.

In addition to this he has a right to the person and society of the wife, and may have a habeas corpus to bring her person out of any illegal confinement and may otherwise control her conduct.

These are rights which vest, not upon the happening of a contingency, but immediately upon the entering into the marriage contract. They are interests created by the law of the land, and the consent of the parties. They confer a right of action—are in themselves valuable and are such as may be asserted in a court of justice. Even the *choses in action* of the wife, the very subject involved in the suit at the bar, is by the authorities cited, vested in the husband, not to a limited extent, not depending upon his reduction of them to possession (for that only becomes a question in the event of either surviving the other,) but absolutely, and for all beneficial purposes en-

tirely made his property. A property which the courts will enable him to assert if their agency be necessary, and which he may sell, release, or convey, without the aid of the courts. Upon the death of the wife he takes them as survivor, and his representative will take them to the exclusion of the next of kin of the wife.

As I shall have occasion again to refer to this point I will not press it further at this time.

The second point raised in this case is, that the act pleaded by the defendants, impairs the obligation of the contract, and therefore is in contravention of the constitution of the United States and of this State.

The supreme court of the United States has said, "That any deviation from the terms of a contract, by postponing or accelerating the period of the performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however minute or immaterial in their effect upon the contract of the parties, impairs its obligation."

Judge Story says, it is perfectly clear, that any law which enlarges, abridges, or in any manner changes the intention of the parties resulting from the contract, necessarily impairs it. The manner or degree in which this change is effected, can in no respect influence the conclusion, for whether the law affect the validity, the construction, the duration, the discharge or the evidence of the contract, it impairs its obligation, though it may not do so to the same extent in all the supposed cases. * * * * * * A fortiori. a law which makes the contract wholly invalid or extinguishes it is a law impairing it. * * * * Further, he says, "if there are certain remedies existing at the time when it is made, all of which are afterwards wholly extinguished by new laws, so that there remains no means of enforcing its obligation and no redress—such an abolition of all remedies operating in presenti is also an impairing of the obligation of such contract."

The broad and comprehensive operation of this rule as laid down by Justice Story, is the same as adopted by the supreme court in several other instances and by Chancellor Kent, is recognised as fixing true extent of cases, which embraces and by the operation of this rule as above defined, I propose to examine the case at bar.

The act pleaded as divorcing Gentry and his wife, and as set forth in the plea, does not free the parties from certain liabilities or inconveniences, but declares the contract of marriage wholly at an end. In the language of Judge

AUG. TERM
1835.

The State
v.
Fry & others.

4 U. S. con. Rep. 467.
8 Wheaton 1.

Story's com. 503-4 sec. 703.

1 Kent com. 391.
4 U. S. con. rep. 577.
6 Cranch 87. 7 do
164. 9 do 43.

AUG. TERM
1835.

The State
v.
Fry & others.

4 U. S. con. rep.
539.

Ib. 578.

Story, it entirely extinguishes it and thereby affects its duration. Its force and operation as contended for by the defendants, is, that it entirely ends and extinguishes the contract, and not only so, but it destroys all the rights of the husband to sue for and recover the choses in action of the wife. Or in other words that it bars him from recovering from the Guardian of his wife, that which by the declaration he is charged with having received in right of the wife, before and after the date of the act of divorce. It surpasses my ingenuity to furnish any other conclusion, than that the act pleaded, impairs the obligation of the contract between Gentry and his wife. Bt it is said that granting a divorce is but to release the injured party from further performance, when there has been a breach of the contract by the other, and is not impairing the obligation of the contract.

The language of C. J. Marshall is relied upon as a confirmation of this position. The position in the case in which it was used by C. J. Marshall is certainly correct. But he uses the expression not in connexion with the power of the legislature, to pass special or individual divorces, but in relation to the power of the legislature to pass general laws of divorce. Laws operating not on two individuals; but which affect the whole marriage relation within the State and the marital rights of every citizen, equally and alike. His language is not susceptible of a different construction. He says, "It never has been understood to restrict the general rights of the legislature to legislate on the subject of divorces. Those enable some tribunal not to impair a marriage contract, but to liberate one of the parties, because it has been broken by the other. Such was the understanding of Judge Story, as expressed at the time, in the same case, and such was the understanding of the supreme court of New York, in the case of Holmes v. Lansing. The supreme court of the U. S. have said, that if an act be done under a law, a succeeding legislature cannot undo it. Now in the case at bar, Gentry and his wife were duly married by a law in force, and in the year 1833, the legislature passed a law saying that marriage shall be no longer in force.

The legislature does not undertake to define what shall be cause of divorce between married persons within the State of Missouri, but they select from the mass of society two isolated individuals, and without their consent or approbation, without any expressed or supposed breach, without giving any court a power to hear and determine the matter, without giving either party a right to appear

and defend, without referring to any violation or even supposed violation of the laws of the land, they declare the marriage at an end.

Can such legislative acts with any justice, be said to be an enforcement of the contract? and if so, by what rule or argument is this class of contracts withdrawn from the rule which operates upon every other contract. Would not a fair rule which was equally binding on the whole community, say, that if the legislature have the power to thus annul this contract, that they have equal power over the contracts between Guardian and ward, master and apprentice (for these are purely municipal contracts) and the same over every contract for the sale of a horse. or the transfer of a tract of land or other article.

It is true the legislature were not bound to assign a reason for the act, but when this act stands operating so as to destroy a contract, legally formed upon a subject already transferred to the judiciary, and no cause is assigned, and none is assignable, which shows it to be any thing else than the result of a claimed transcendent power in the legislature, how shall the judiciary determime its character? The law from its own operation and enactment proves it to be out of the ordinary sphere of legislation, not in its character *ex directo,* but mandatory and absolute.

It then is highly incumbent on those who would sustain the legality of the act, to show some ground, some constitutional provision, by which the court shall sustain it. But it is said there is no difference whether the legislature or judiciary divorce the parties, the one as much impairs the contract as the other. To this it is sufficient answer to refer the court to the objects of the action of the two bodies. The power of the legislature is to declare what the law of the land shall be and their action is always presumed to precede the conduct or action upon which the laws passed by them are to operate. The judiciary act upon conduct or actions past as controled and governed by the law in force at the time of the commission of the action complained of. Hence when they decree a divorce they simply say, that by the conduct of one of the contracting parties as controled and regulated by law at the time of its commission, the other is free from any further obligation. It is on this ground that equity will declare the contract at an end, not only in the case of marriage, but in every other transaction in society.

This argument proves that there is a material and distinguishing difference as to which shall decree the con-

AUG. TERM
1835.

The State
v.
Fry & others.

3 Dallas Rep. 386.

7 John's. Rep. 477.
Story's com 510,
sec. 711 & 712.

tract at an end, for it proves that it is properly the province of the one and not a duty of the other.   True it is, if both are equally valid and binding, the effect is the same on the contract, but the question involved is not the effect but the right.

The third point raised in this case is, that the act is retrospective in its operation and therefore unconstitutional and void.   This is said to be, but another manner of expressing the second point.   It is true, that all laws which impair the obligation of a contract, are retrospective, but the converse of this, is not equally true—retrospective laws may act on other things than contracts.   Retrospective laws are equally as pernicious in their effect, and in our constitution equally as strongly provided against as laws impairing the obligation of the contract.   Such laws are said neither to accord with sound legislation nor with the fundamental principles of the social compact.   Yet the constitution of the United States has not made any provision against their passage, and many of the state constitutions contain no guard against them.   In all such, retrospective laws may be passed, and when passed are binding and obligatory on the judiciary.   The constitution of this state, however, has provided against these laws in express terms, and therefore all such as have a retrospective action, either upon contracts or other acts are by that provision void.

Upon this point fewer decisions have been made by the judiciary, than upon the preceding second division, and from this cause, as also from the great reason there is to believe that this point in the cause at bar, is more properly embraced in the said decision, my remarks upon this will be limited.

The argument, that the act pleaded is retrospective, is founded on the language of the constitution, and the effect claimed for the act by the defendants.   That language is, "no law retrospective in its *operations* can be passed."   The language of the constitution is peculiar in this, that it uses the word *operation*, evidently showing that it is the effect and not the declarations of the act, which the framers of the constitution had in view; and which they intended to guard against.   Consequently, it is by the operation and effect, which the act divorcing Gentry and his wife, has upon the contract between him and his wife and upon rights springing up under it or growing out of it, that this court will be bound to judge this case, and not by any declarations in the act.   In this view of the argument, I have but to ask the court to

look to the effect claimed for the act by the defendants, and the force and construction given to it by the court below, as it appears from the record.

The suit is founded upon a Guardian bond, dated the 3rd day of February 1827, and the parties were married on the 28th day of January, 1830.

The breaches assigned are that on the 3rd day of February 1827, Fry received as Guardian of the said Elvira, the wife of Gentry $2000, on the 3rd of May 1830, the further sum of $1500, on the 3rd of August 1831, the further sum of $500, on the 2nd of September 1832, the further sum of $500, and on the 1st of September 1833, the further sum of 1000, making in all the sum of $5500. Which said several sums, nor either of them, has the said Fry accounted for, or paid over to the said Gentry, or to his wife, or to any person authorised to receive the same. All this appears in the declaration, and is admitted in effect by the plea. To this the defendants plead that on the eleventh of February 1833, the parties by the act of the legislature were divorced.

The four first sums were received by the Guardian, before the passage of the act of divorce; now to these it certainly cannot with justice be said, that Gentry had not a vested right to them prior to that act. They were choses in action which Gentry took, which he might for a valuable consideration have assigned away, and which were subject to the claims of his creditors, and could have been assigned for their benefit, to the actual exclusion and bar of the right of the wife—he had a right of action to have reduced them to his possession, which he might have asserted in a court of justice. In the event of his surviving his wife, they would have passed to him and to his legal representatives, to the exclusion of her next kin. These rights, valuable in themselves, were, up to the passage of the act pleaded by the defendants, fully and completely vested in Gentry, but by the operation of that act, operating back upon the vested right—they are destroyed and taken away from Gentry.

But say the defendants, these rights were rights contingent and dependent upon Gentry's reducing them during the coverture, to possession. This assertion is broader than the law. For as I have shown, he had a right after the termination of the coverture, in the event of his surviving his wife, and besides this, if his title to the money was not absolute, yet his right to an action whereby the contingency might have been destroyed, was absolute and uncontingent, choate and perfect. Even take

it, that he had but a limited property. By what reason shall it then be said, that an act thus retrospecting upon Gentry's rights and divesting him of them is not retrospective in its operation. To illustrate this further, take the holder of a bond for title to land, he has but an equitable title to the property, which may be defeated by the fraud of the vendor, in many ways. He has nothing more than a contingent interest to land, or the damages, and depending entirely on his action in the courts for the perfection of it. Suppose in such case the legislature pass an act declaring the contract at an end—would not that act be held retrospective as operating back on the already vested right of the vendee? It might be said, that this would more properly be impairing the obligation of the contract than acting retrospectively, but in such cases I hold the terms to be nearly synonymous, but that it is retrospective because it operates back to the time of the inception of the right, and is not confined to the date of the passage of the act. Thus Gentry's right, whether limited or absolute, to his wife's choses in action, accrued and vested in him at the time of the marriage, and the act of divorce pleaded by the defendants, operates back to that time, and divests the right and title then taken. Such is the effect claimed by the defendants, and given to it by the court below. The right of the legislature to declare certain things shall be causes of divorce, which were not causes at the time of entering into the marriage contract, has never been conceded by me to the extent claimed by the defendants—nor is that question properly involved in the decision of the cause at bar. If it were conceded to the extent claimed, yet I apprehend it would not endanger or militate against the principle which I contend for. Marriage being a contract, *jus gentium*, & the parties entering into it as such, it may safely be admitted that the safety & policy of every nation should prescribe within its own limits, what shall amount to a breach or destruction of the contract, in all cases where the parties have become domiciled *bona fide et animo remanendi*.

Ferguson's Rep. 276.
This position is sustained by the reasoning of the court of sessions of Scotland in the case of Gordon v. Pye.
Cited by Kent 96. When the marriage is entered into, it is not formed upon the belief that it is entirely to be executed in the country in which it is formed, but that it may be partly executed in one country and partly in another. Therefore it is reasonable to believe, that the contract when made, is made upon the understanding that the material rights and causes of its destruction or dissolution shall be such as the

general and municipal laws of the country, where the parties may be *bona fide et animo remanendi* domiciled, shall from time to time establish. This goes upon the hypothesis, not yet settled, that the *lex loci contractus* only controls to establish the validity of the marriage, and that the *lex domicilii* or *lex loci* delicti governs as to its construction and duration. Besides this power rests on the right of the legislature or municipal authority, to impair or retrospect on the obligation of the contract, but upon their right to establish checks to a breach of the contract and furnish the judiciary with the means of punishing a breach when committed. This brings me to the fourth position assumed in this cause.

The fourth point raised is, that the power to grant divorces, or in other words, to decide that there has been a sufficient violation of the marriage contract to annul or destroy it, is an exercise of *judicial power*, and not a *legislative duty*. The clause involved in this enquiry is in these words: "The powers of the government shall be divided into three distinct departments, each of which shall be confided to a separate magistracy and no person charged with the exercise of powers properly belonging to one of those departments shall exercise any power properly belonging to either of the others, except in the instances hereafter expressly directed or permitted."

It is demonstrable from the authority of the expounders of the structure of the English Government and of our own constitution, that this great political apothegm contained in the above article of our constitution, has been expounded and at this day is received and understood as conveying a distinct meaning, susceptible of a useful and political application. Montesquieu has been acknowledged as the oracle of this invaluable precept, and subsequent expounders of constitutional law have with perspicuity and definitiveness attached a meaning to his language when he says, "there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates, or if the powers of judging be not separated from the legislative and executive powers." This has at all times been a favorite maxim of patriots and statesmen, and has been the fundamental axiom upon which each of the state governments and United States Government, has been built. In most of the states, it is as in our own, expressly recognized and made a fundamental principle, and although a difference of phraseology may be found in nearly all of them, yet the principle is the same in all. It is but a different method of ex-

AUG. TERM
1835.

The State
v.
Fry & others.

18

AUG. TERM
1835.

The State
v.
Fry & others.

Federalist No. 47,
48, 49.

Jour. of the conv'n.

Story com. 196.

Federalist No. 47.

Ib.

Story com. 197,
sec. 267.

pressing the same idea. Others of the state constitutions, and the Federal constitution contain no express provision upon this subject, but yet the spirit, scope and structure of these governments prove that it is equally as inherent in these as in those having an express provision containing the axiom.

The first resolution passed in the convention which framed the Federal constitution, was to declare as the ground work of the superstructure which they were about to rear, that, "A national government ought to be established, consisting of a supreme legislative, judiciary and executive." Upon this as a settled principle was built the United States constitution—and in after times when a talented and powerful opposition was made to the adoption of this instrument, because it contained no express provision upon this subject, the framers of the instrument met the argument, and proved conclusively that it was provided for by the structure and frame of government proposed in the constitution. This lead to enquiry, as to the true meaning and application of the maxim, as expressed by Montesquieu and as adopted and understood by the framers of the State and the framers of the United States constitutions.

Montesquieu derived his idea of the propriety and utility of this principle from the British constitution, and Mr. Madison speaking of Montesquieu's language and the interpretation to be put upon it, says: "His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that when the whole power of one department is exercised by the same hands, which possess the whole power of another department, the fundamental principle of a free government is subverted." And when the same author further comments on the meaning of the author of the spirit of laws, he says: "That the reasons on which Montesquieu grounds his maxim, are a further demonstration of his meaning."

This separation of the departments of government has received a further and equally lucid exposition by Justice Story—speaking on this subject, he says: "It is not meant to affirm, that they must be kept wholly and entirely separate and distinct, and have no common link of connexion or dependence, the one upon the other, in the slightest degree—the true meaning is, the whole power of one of these departments should not be exercised by the same hands, which possessed the whole power of either the other departments, and that such an exercise of the

whole, would subvert the principles of a free government." From these expositions of this maxim contained not only in our own state constitution but in several other state constitutions, and interwoven into the spirit of all the republics of the Federal Government, made by the framers and expounders of them.  I hold that it is now settled, that the legislature as a body cannot perform any judicial act, other than those that are expressly permitted or directed by the constitution, and which may be enumerated as simply the right of trying impeachments and judging of the election of the members of its own body.

Beyond this they cannot go.

This puts to rest the doubt attempted to be raised, that this was partly a personal disqualification.  It proves not only that the same person shall not be a legislator and a judge at the same time, but it also establishes the truth of the position, that the disqualification extends beyond the person to the department, and that one department shall not exercise the powers which properly, and by the constitution belong to another.  The use of it in the constitution, is not a novel principle used by the members of the convention, without any definite or fixed idea of its meaning, its utility or its application.  The argument is not therefore well founded which endeavors to raise a cloud of doubt and uncertainty as to its meaning or operation, and can only be raised, that in the midst of this fog of uncertainty the defendants may escape from its effect.  This *parchment barrier*, has from the history of the past legislation of the several states, in numerous instances, been found a wholesome, but not at all times, a complete protection of the more feeble from the encroachments of the stronger departments of the government.  Its design is evidently to furnish protection between the different departments but in no instance has this just object of every well balanced government been more repeatedly defeated, than in numerous instances of legislative aggression, and intrenchment upon the other departments.  The earliest as well as the latest history of the country is filled with these melancholy instances of political turpitude.  Under the plea of the negative character of the specification of their powers and their direct responsibility to the people, the source of all power, this branch has every where extended the "sphere of its activity" and attempted to draw "all power into its impetuous vortex."

Applications of the political maxim, above cited may at

AUG. TERM
1835.

The State
v.
Fry & others.

Also Tucker's
Blac. 48, sec. 5.

AUG. TERM
1835.

The State
v.
Fry & others.

times involve some doubt in cases of a mixed or doubtful character.

Questions may occur in which the powers of the legislature and that of other departments may clash, and it may be doubtful to which the jurisdiction belongs. But I cannot conceive of any such doubt existing in the question involved in the cause at the bar.

Upon the definition of the second article of the constitution, above given, from the author of the Federalist, and justice Story, it does seem to me plain, that the case of Gentry and wife comes not only within the spirit, but also the strict letter of the prohibition, there intended to be guarded against.

Federalist No. 48. "It is agreed on all hands (says Mr. Madison) that the powers properly belonging to one of the departments, ought not to be directly and completely administered by either of the other departments." Yet here in the case of Gentry, which I presume I have already shown to be a contract, we find the whole power of the judiciary, over the contract, taken up and exercised over it and this is done by the hands which possess the whole power of another department. I say the whole power of the judiciary has been exercised by the legislature, for they have not only decreed that the parties shall be divorced, but they have passed a judicial sentence upon the whole contract and all its incidents and declared them at an end. It has not been contended, but that such an exercise of power in relation to any other contract, would be an encroachment upon the judicial prerogative. To pass upon the breach of a contract and declare the result which shall flow from it, is admitted to be the province of the judiciary in all cases which are not by something peculiar in the contract itself withdrawn from the power of that department. It is the business of a Judge to determine the existence of the breach, and pronounce the sentence which the law imposes upon that breach. Yet in the case under consideration, we find the whole ground occupied by the legislature; they find the violation of the contract and determine the sentence. But it is contended that marriage is a peculiar kind of contract, which from its incidents and the manner in which has been dissolved by other powers, does not come under the same rule with them and therefore forms an exception to this article of the constitution. This branch of the cause I shall examine by a reference to the history of divorces in that country from which we borrow our system of juris-

prudence and the history of these causes in our own country.

Divorce from *diverto* a breach or dissolution of the bond of marriage, is thus defined.

The separation of two *de facto* married together made by law; it is a judgment spiritual, and therefore ought to be reversed in the spiritual court. Divorces are of two kinds, *a vinculo matrimonii*, and *a mense et thoro.* It is a fact connected with this definition, that in all nations the manner of obtaining a divorce, and the cause for which it might be obtained, are fixed by the municipal law of the country. Not a law dependant upon the whim and caprice of the law making power, and subject to be changed and altered to suit individual cases, but a law extending throughout all the country and affecting alike the whole people. The Romans allowed two kinds, which they distinguished by the terms *repudium* and divortium. The Turks have three kinds. The laws of the Pagans, Jews, Mahometans & Grecians admitted only of one kind called divorce. Under the Mosaic dispensation and during the Jewish economy, this continued to be regarded as a cause pertaining to the civil authority, and upon the separation the husband gave the wife a writing to this effect: "I promise that hereafter I will lay no claim to thee."

"But afterwards as Dr. Godolphin observes, by the concessions of Princes, such causes were determined in the spiritual courts. And the reasons why the cognizance thereof, hath been *permitted* to the spiritual court, are divers &c." The principal reason of this concession is found in the sacred character with which marriage was invested as before shown. But it is not necessary to enquire into the cause which led to the jurisdiction of the ecclesiastical courts, for my only object is to show, that it was an exercise of a *judicial function* and not a *legislative* power.

Among the Athenians, the suit for a divorce was conducted very similar to our bills in chancery. The suit was brought before the judge, by petition, and if the wife was petitioner, she was bound to appear in person. The freedom of divorces amongst the Romans as re-established by the novels of Justinian continued down to the ninth or tenth century, when the church assumed a supremacy over it, and for a time abrogated all divorces. The latin Catholic church holding marriage as a sacrament disallowed divorces altogether, and this continued to be the law of France down to the time of the French

AUG. TERM
1835.

The State
v.
Fry & others.

Encyclopedia.
Divorce.

Josephus.

Encyclopedia vol.
23.
1 *Inst.* 134.

Taylor's civil law
352-3.
Plutarch's lives.

Pothier marriage.
2 Kent 87. Quarterly review N.o.
56 p. 509.

AUG. TERM
1835.

The State
v.
Fry & others.

Code Nap. No. 9.
33, 75, 97.
Tho. Coke L.
146, n. E. ibed,
659. n. 9. 1 Bla.
com. 44. Hoff.
leg. out. 150.
4 Bac. 551.
2 Kent 85, 7, 8.

Hoff. legal out-
lines 272.

1 Blac. com. 9.
1 Kent. 420.
2 Dall. 410, 14.
Thos. C. L. 146,
n. E.
2 Burns Ecl. 501.

revolution. The Greek and the Protestant church held it differently, and have, where those religions prevailed, divorces continued to be allowed. The code Napoleon allows divorces in cases submitted to the judicial tribunal for numerous causes, one of which is, the mutual consent of the parties. The law of most of the German Empire, allows but two causes of divorce, which are to be ascertained by the judiciary.

In England divorces a vinculo are granted by parliament, and divorces a mensa et thoro by the ecclesiastical court. But although divorces a vinculo in that country are only obtainable through the act of parliament, yet I hold that act is in its character, properties and in estimation of law, a judicial sentence. To prove that this is a sentence and not a law, I might content myself with the language of Blackstone. He says that a sudden or transient order is not a law, but rather a sentence. That an act to confiscate the goods of Titius, or attaint him of treason, does not enter into the idea of a municipal law, for the operation of this act is spent on Titius only and has no relation to the community in general; it is rather a sentence than a law. Mr. Hoffman gives a further illustration of this expression. He says, "That Titius having violated some existing law has subjected himself to a legislative declaration, sentence or decision by which the penalty of the violated law is merely ascertained and enforced, and that the act is not properly a statute nor law, nor done in the exercise of the legislative power. This he says only applies to a quasi judicial sentence, pronounced by a body which ordinarily concerns itself in legislation. Mr. Hoffman evidently assents to the opinion of Blackstone and states in stronger terms, for he says it is not done in the exercise of *legislative power*, and his object is to show, that it is not the number of persons upon which the act operates that changes its character from a law to a sentence, but that it is the thing acted upon, and the powers of the body by which it is pronounced that renders it such. Hence if the act be purely directory, and emanate from a body having only legislative powers, it must be a law though its operation is confined to A. & B. for such body cannot pass quasi *judicial* sentences.

The English parliament exercises many judicial functions in addition to that supreme power which it possesses over the constitution, and which is not possessed by our State or Federal legislatures. In decreeing divorces by parliament, two facts are worthy of observation, that parliament will not grant a divorce a vinculo, but for one

cause, which is adultery, and that must first be judicially ascertained by some of the courts of Common law, and a sentence of divorce from the spiritual court, unless there is something of a peculiar character attending the parties, which renders the observance of this caution impossible. And again, such acts, at least in every instance except one, only operate from the time of the perpetration of the adultery. The fact therefore that parliament confines its action to this one breach, shews most manifestly, that the divorce is not obtained from the plenitude of its legislative power, but from a judicial ascertainment of the breach by virtue of a power inherent in the construction of the British parliament. This argument is supported by the analagous reasoning of the U. S. supreme court, in the case of Calder v. Bull.

From the construction of the British Parliament, from the manner in which it has, at all times, exercised its power in relation to this subject, I infer that it is exercised, not as a branch of the legislative prerogative, but as a portion of its judicial power. But however this question may actually be, this fact is conclusively settled. The common law tribunals of England, have power over it to a certain extent, and at all times do recognize both the sentence of the ecclesiastical courts and the sentence of parliament as *res judicata* against which nothing can be averred, and as final and conclusive until reversed or set aside. Thereby showing that they are received upon the principle, that the sentence of law has been pronounced in the cause.

In connexion with the language and spirit of our constitution, this construction, to my mind is rendered still more certain. A preliminary question ought here to be first disposed of. That is, that the practice of many of the legislatures of the several states prior to the adoption of our constitution prove that this in the minds of the framers of our constitution was not esteemed a branch of the judicial power. The evidence which is furnished by the history of the practice, and course of the legislatures of the several states, is very contradictory, and at best, of very doubtful character. The question of the power of the legislature to grant divorces, has never before the present been mooted in the courts nor have we any judicial decision, defining the true [limits] between the judicial and legislative departments, growing out of this or any other similar question.

All, therefore, which we have, is the fact that it has been thus exercised coupled with the expressed doubt and dis-

*Margin notes:*

AUG. TERM
1835.

The State
v.
Fry & others.

1 Blac. com. 442.

Hoff. L. outlines 528.
3 Dall. Rep. 386.

1 Cranch 177.

2 H. Blac. Rep. 145. C L. 660.

4 John's. Rep. 343.
6. Crauch 321.
2 Kent 166.

Jac. Dic. Judg't.

The State
v.
Fry &_others.

2 Kent com.
Tuckers notes
435-440.

Jeff. notes on Vir-
ginia 195.

trust of the ablest commentators of the land. The fact that numerous legislatures have passed laws divorcing parties, furnishes no evidence of their right to exercise such power, but gives additional force to the repeated assertion, that the legislative department "has every where been extending the sphere of its activtiy and drawing all power within its capacious vortex." Having a superiority of influence in the government, having a more direct influence upon the people, and being prescribed by less definite rules of action than either of the other departments, they have pursued the natural bent of all such bodies, and under the mask of complicated and indirect measures, carried out with success, not only this, but numerous other instances of usurpation totally unjustifiable by the letter and spirit of our institutions. Instances of this kind have existed from a period shortly after the formation of the Virginia constitution down to the present time.

As early as 1783 and 1784 this disposition to flagrantly violate the constitution, was pointed out by the committee of censors that assembled in Pennsylvania. In 1791, the same disposition was detected by the council of revision of the State of New York. Instances of this kind might be multiplied without end, but I prefer concluding by quoting the remarks of Mr. Jefferson, in his notes on the State of Virginia, and I quote this because the practice of that state has been cited as an example entitled to great weight. Mr. Jefferson speaking of the disposition of the legislatures to encroach upon the other department says, "*they have accordingly in many instances, decided rights, which should have been left to judiciary controversy and the direction of the executive during the whole time of their sessions is becoming habitual and familiar.*"

There is nothing in the government which probably has furnished a more ample field for this encroachment, than that of divorces. It is usually obtained before the legislature in cases where both are satisfied with the decision, where but small amounts of property are involved and no motive is held out to controvert the correctness of the act. This is evident from the fact that the point has never been judicially presented for adjudication to any court in the states. Such causes have come before the courts, it is true, but the constitutionality of the legislative act has never been raised. Had the framers of our constitution turned their attention to the other states, had they, as they doubtless did, examined their

constitutions; their statutes and their practice, they
would have found a confusion between principle and
practice, wholly irreconcilable with either side of the
question. They would have found in many, a line drawn
between the departments, yet they would have seen,
that in some states it was given exclusively to the judi-
ciary, in others they would have found that the statute
recognized and declared it a flower of the judiciary, but
it was concurrently—and in some exclusively exercised
by the legislature. Cotemporaneous practice therefore
would not have furnished any light upon the subject.
Hence I infer that in this, the language of Chief Justice
Marshall, speaking of another clause of the constitution,
is applicable to this. "It is more than possible that the
preservation of rights of this description were not parti-
cularly in the view of the framers of the constitution,
when the clause under consideration was introduced in-
to that instrument." As all the facts conspire to this
conclusion, I submit whether this court will not feel bound
to adopt the rule, which the same Judge adopted in the
case above referred to. That rule is this.

The case being within the words of the rule, must be
within its operation likewise; unless there be something
in the literal construction so obviously absurd, or mis-
chievous, or repugnant to the general spirit of the in-
strument, as to justify those who expound the constitu-
tion in making it an exception. It is not pretended that
any such exception can be found in the language of our
constitution; but on the contrary, several other clauses
of that instrument, harmonize with the construction claim-
ed by the plaintiff. The 5th article provides, that the
judicial power, as to matters of law and equity shall be
vested in a supreme and other courts—and again, in our
bill of rights it is said, "The courts of justice ought to be
open to every person and a certain remedy afforded for
every injury to person, property, or character, and that
right and justice ought to be administered without sale,
denial, or delay &c." And again, "that the right of trial
by jury shall remain inviolate." Throughout the whole
instrument, there is no expression used which will justify
the exception. No distinction is made between this and
any other case, the marital rights of the citizens, and
their rights to any other property whatever. If we re-
sort to the history of this state, we find every ground for
the exception, taken away.

In 1807 a law was passed giving the right of granting
divorces to the superior court of the Territory of Louis-

AUG. TERM
1835.

The State
v.
Fry & others.

Revised code.
Consti.

Geyer's Dig. 13º.

AUG. TERM
1835.

The State
v.
Fry & others.

iana. This law fixed the causes for which divorces might be granted, and specified the manner in which the suit should be brought. In 1812, Missouri was by Congress created a distinct territory, under the organic law,—this law continued in force in the territory of Missouri until 1816, when the same law was re-enacted and the jurisdiction transferred to the superior or circuit courts, and thus the law continued during the time of the sitting of the convention which framed our constitution.

After the adoption of the constitution, it became a law of the State and remained unchanged or altered until the session of 1825, when the law was again re-enacted with such modifications as suited the state courts and the constitution.

If the history of the times furnish any evidence of the minds of the framers of the constitution and this is a legitimate source of argument, here is abundant proof that the framers of our constitution regarded the power to decree or grant divorces as a flower of the judiciary. In the language of this court, in the case of the State v. Simonds the convention "saw its effects daily, yet they have used no where any prohibitory words regarding it." They saw it fully and firmly vested in the judiciary, they saw cases decided by the judiciary under the existing statute, they saw the whole control of the cause of divorce vested in that department, and yet they engraft a fundamental maxim which in express words takes away all concurrent jurisdiction from the other department and make no exception either directly or indirectly in favor of cases of this character. Upon what ground then shall it be said to constitute an exception to the rule they have established.

3 Mo. Decis. 414.

It can rest upon nothing except it be said that there is no express prohibition. I have already attempted to shew that such prohibition exists in express terms. The case at bar is prominently distinguished from the case of the State v. Simonds. In the case of corporations, the convention have made a distinction between lay and religious corporations, expressly prohibiting the latter and thereby giving a tacit assent to the creation of the other. And a right to create, necessarily implies a right to invest the thing created with all the requisite functions and powers necessary for the carrying the purpose of its creation into effect. Upon this hypothesis I presume this court sustained the legislative power in the corporation of the city of St. Louis and upon the same they indubitably will sustain the power of the courts in this case.

But if I am in error as to the fact that this power ney-

er was exercised by the territorial legislature, yet the fact that the same power was invested in the courts both by the territorial legislature and the legislature which met under the state constitution coupled with the clause of that constitution which prohibits a concurrent exercise of powers, I am surely sustained in the assertion that it was understood by the framers of the constitution as a prerogative of the judiciary. If to grant a divorce is a legislative power, it cannot belong, nor can it be exercised by the judiciary. This is so obvious that it needs no argument. Can it then be supposed that the framers of the constitution (for the first legislature was chiefly composed of them) would be the very first to violate the instrument they had just created. Certainly not.

There is but one additional argument which I esteem demands an answer, that is that the exercise of this power by the legislature does not infringe the right of trial by jury. As I have heretofore given my views on this point, I shall content myself at this time with noticing the objection made by the defendants, that by the laws of the territory causes of this character were not triable by jury. This is evidently a mistake upon their part in the history of our law.

By the laws of the Territory this power was vested in the *General Superior* court which exercised the chancery powers of the State. This court had under the laws of the Territory of Louisiana and under the laws of the territory of Missouri, whenever a fact was asserted on one side and denied by the other, a right to cause issues to be made upon and have the same tried by a jury. This is a conclusive answer to the argument, that it was only of things having a pecuniary value exceeding twenty dollars that the trial by jury was intended to operate upon and be secured to. However much force the argument might be entitled to in a cause coming exclusively from the law side of the courts, it can have no where applied to proceedings which belonged to the chancery side.

I have now endeavored to notice the leading arguments of the defendants and the main points relied on by the plaintiff—there now remains but one consideration to be disposed of and that is the variety of practices which have obtained in the different states upon this subject. From this contrariety of proceedings in the same character of case, it is said that the question is of doubtful character and being so, this court ought to lean to that side upon which the majority of practices is to be found.

I admit the vexed character of the question under dis-.

AUG. TERM
1835.

The State
v.
Fry & others.

Geyer's dig. 169 & 105.

Ib.
109-114-117.

AUG. TERM
1835.

The State
v.
Fry & others.

Argument of
defds. counsel (in-
corporated by the
Judge into his o-
pinion.)

cussion and the contrariety of practices which has obtain-
ed between the legislatures and the judiciary of the sev-
eral states.   But I have before shown than this confu-
sion furnishes no light as to the true construction which
should be given to our constitution—and that the only ev-
idence which this court can have is the language used in
that instrument.   By that, aided by such judicial decis-
ions as may exist upon this subject, I am willing to rest,
feeling satisfied that this court will act from that and
that only, and that however their decision may operate
to destroy former practices, or whatever effect may flow
to individuals, who may have misunderstood the law, yet
they will not be suffered to weigh against the clear con-
clusions which the court may form in this case.''

To repel the arguments and authorities produced by
Mr. Chambers, Messrs. Hunt & U. Wright have made
many points and cited many authorities.   Mr. Wright's
argument is as follows: "The point raised for the decis-
ion of this court is the constitutionality of the divorce
pleaded—and the grounds upon which the act of the le-
gislature is impugned are, 1st, That it impairs the obli-
gation of what is treated as the contract of marriage be-
tween Gentry and his wife.   2nd, That it is retrospective
in its operation.   3rd, That it was invasive of the right
of trial by jury, and 4th, That it was the exercise of ju
dicial power prohibited by the constitution.   In the view
we take of this cause, these several positions resolve
themselves into but one point, to wit: whether the gran-
ting divorce by act of the legislature was the exercise of
judicial power, not warranted by the constitution.   But
lest this view be erroneous, we shall notice each posi-
tion assumed.   1st, Is marriage a contract in the sense
of the Federal and state constitutions, which declare, that
no state or legislature shall pass any law impairing the
obligation of contracts.   The prohibition was doubtless
placed in the Federal constitution from a belief that it
would be a salutary restraint on state authority—and in
the constitutions of the respective states, to provide for
the possible calamity of a disruption of the confederacy—
when the constitution of the United States would cease
to be the constitution of each member of the Union.   But
wherever found, it has the same meaning, and embraces
contracts of the same character.   Whatever *contract* is
placed, by the Federal constitution, out of the action of
a state, is put by our bill of rights beyond the control of
our legislature.   The clause in the Federal constitution,
has often been the subject of judicial exposition, by the

supreme court of the U. States—but the cases carried to that tribunal have risen, only upon property contracts—or contracts of pecuniary obligation. There is no question, but that contracts of this character are embraced within the prohibition—but we are of opinion that it is confined to such. We think it clear, that the clause was introduced in the Federal constitution, to guard against a power of at least doubtful utility, the abuse of which had been extensively felt. That anterior to the formation of the constitution, a course of legislation had prevailed in many if not all the states, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements; and that this mischief was sought to be cured, by restraining the states from violating the right to property through the clause in question. See the Federalist p. 243, where, Mr. Madison commenting on this clause says—"very properly therefore have the convention added this constitutional bulwark, in favor of personal security and private rights. The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret, and with indignation, that sudden changes, and legislative interferences, in cases affecting personal rights, *becomes jobs* in the hands of *enterprising* and influential speculators; and snares to the more industrious and less informed part of the community. They have seen too, that one legislative interference is but the link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding. They very rightly infer therefore, that some thorough reform is wanting which will banish speculation on public measures, inspire a general prudence and industry, and give a regular course to the business of society." It requires no argument to shew, that violated marriage contracts, were not, in the contemplation of this commentator and framer of the instrument. It is equally clear that the term contract was not used in its broadest sense. That sense would comprehend the political relations between the government and its citizens—would extend to offices held within the state for state purposes and to many of those laws concerning civil institutions which must change with circumstances, and be modified by ordinary legislation—which deeply concern the public, and which to preserve good government, the public judgment must control. Taken in this broad unlimited sense, this clause would be an unprofitable and vexatious inter-

ference with the internal concerns of a state; would un-
necessarily and unwisely embarrass its legislation & ren-
der immutable those civil institutions which are establish-
ed for purposes of internal government, and which to
subserve those purposes ought to vary with varying cir-
cumstances.

The framers of the constitution could never have in-
tended to insert in that instrument a provision so unne-
cessary, so mischievous and so repugnant to its general
spirit: and since the term contract must receive in con-
struction some limitation, it may and ought to be confin-
ed to contracts of pecuniary obligation. In reply to
these views, C. J. Marshall in the case of Dartmouth col-
lege v. Woodward so often recurred to in the former ar-
gument of this cause says: "The general correctness of
these observations cannot be controverted—that the fra-
mers of the constitution did not intend to restrain the
States in the regulation of their civil institutions, adopted
for internal government and that the instrument they
have given us is not to be so construed, may be admitted.
The provision of the constitution has never been under-
stood to embrace other contracts than those which res-
pect property or some object of value, and confer rights
which may be asserted in a court of justice. It has nev-
er been understood to restrict the general rights of the
legislature to legislate on the subject of divorces."

How far marriage is a civil institution to be regulated
and controled by ordinary legislation, and how far it
ought to vary with varying circumstances will more sat-
isfactorily appear from an examination of its incidents.

If it be a contract it must be confessed a singular one.
Bacon defines it to be "a compact between a man and a
woman for the procreation and education of children."
4 vol. p. 524. Rutherford declares it "a contract be-
tween a man and a woman, in which by their mutual con-
sent, each acquires a right in the person of the other for
the purposes of their mutual happiness and of the produc-
tion and education of children." Institutes 1 vol. 214.

It requires then particular parties to make it—the mas-
culine and feminine genders must conspire to bring it
about. There must be a *man* and a *woman*. Two men
cannot make it. Two women cannot—only one man and
one woman under our laws can enter into it—and
throughout the world but one man can enter into it with
more women than one. Each acquires too, a right to the
person of the other—an anomalous right—for the pur-
pose of their mutual happiness, and the production of

AUG. TERM
1835.

The State
v.
Fry & others.

children. A contract for the production of children! and their education, after they are produced. Its consideration, the affections of the heart, is unlike the consideration which supports other and pure contracts— and its ends are the propagation of the human species, and the happiness of man. Unlike other contracts, the consent of parties cannot dissolve it—for unless the municipal law interfere and sunder the tie, it is of perpetual obligation—it merges the legal existence of one of the contracting parties, and puts it out of the power of that party to contract. Infancy will not avoid it, as in other contracts, and tho' it so far resembles a contract under our law as that consent is now necessary to its creation, the common law once permitted parties to enter into it, who were ideots from their birth and who could therefore make no other contract. See 1 vol. T. Coke, top page 144, n (3). Its obligations are not only juris gentium admitting of no modification by the will of the parties, which can be predicated of no other contract, but the courts are powerless to separate the parties even in case of incurable insanity, where one party is forever incapable of performing his part of the mutual engagement. See the case of Gordon v. Pye decided by the court of sessions in Scotland cited 2 Kent p. 115. The lex loci contractus does not govern its rights and obligations. Thus the rights and obligation created by a marriage in New York are lost when the parties emigrate to Missouri. And our law creates new rights and obligations for them. The rights and obligations springing from a marriage in this state would be lost by removal to N. York where new stipulations would be created and enforced by the laws of that country. If the parties contract matrimony in a country which permits its dissolution by mutual consent, and come hither, our laws will recognize the relation but make it indissoluble by consent of parties. If they contract matrimony in reference to the laws of a country which gives the wife a dower interest of one half the estate of her husband—and denies to him the tendency by *curtesy*, and remove hither, our laws will take from her one half her dowry, and give to him a life estate in her lands and tenements. And in so doing it will only follow the example of all other States. At the same time a *marriage contract*—this is a contract made by parties before marriage, in contemplation of marriage with marriage for its consideration, will be respected every where in all countries as of binding obligation. The municipal power of every state will enforce the obligations of a

AUG. TERM
1835.

The State
v.
Fry & others.

contract which has marriage for its consideration while over that relation itself—it will preserve its superintending control. Can it be possible that while every principality in christendom controls and modifies as the peculiar and necessary subject of its municipal power—the relation of husband and wife—the several states of our Union were prohibited the exercise of their sovereign authority over it, by the clause in the Federal constitution concerning contracts? But again—it is said that marriage is not only the contract defined by Bacon & Rutherford—but that the law which defines marital rights—which regulates dower—which creates the duty of the husband to protect the wife and maintain their issue &c.—makes a part of the contract as obligatory and binding as tho' the law were incorporated into its provisions. In other words that when the husband contracts he binds himself to support and maintain the wife—to pay her debts previously contracted, to give her one third of his estate real and personal on his death, the real estate and slaves for her own life and the remainder of the personal property absolutely, in case she have children by him, or in the event of no issue, one half of the personal property, while the wife on her part contracts that she will give him all the personal property which she has in possession absolutely, and as to any she may have existing only in action, she agrees to give him that, provided he reduces it into possession during coverture. She also agrees to give him the use and profits of her real estate during the coverture and if he survives her, and they have issue, she further gives him a life estate in her lands and tenements. They also mutually agree at the time of the contract what shall be the causes of its dissolution, and this is regulated by existing law.

If this be the contract of marriage here—if the law *enters* into and *makes* a part of the contract of marriage in Missouri it does elsewhere, and on correct principles of jurisprudence should be binding every where, but we have seen that while our law recognizes the naked relation of husband and wife if created elsewhere, it clothes it with just such rights and obligations as the municipal policy of the state may dictate. Nor is this power of our legislature confined in its exercise to foreign marriages. It is conceded that the dowry of the wife, the *curtesy* of the husband are subject to the action of ordinary legislation. The legislature may pass a general law on the subject of dower and curtesy, declaring that on the death of the husband, the wife shall take one half instead of one

third of his estate, or it may reduce it to one fourth, or entirely take it away. It may destroy the tenancy by the curtesy, or give it without issue—and this too in respect of existing and subsequent marriages. It may confessedly do all this. It may change, modify, alter, strike out the obligations of this contract of marriage and insert others by virtue of its power over descents and distributions, taking care only not to take away a vested right. Over what other *contract* can it exert such power? But again —the legislature is not governed by the supposed stipulations of the parties as to the manner in which the contract *shall be dissolved*, and the *causes of its dissolution*. It disregards the existing law on these subjects which is said to be embodied in the contract. It may declare other causes of divorce than those stipulated. If the parties contract for dissolution on the ground of adultery only, the legislature may make cruel treatment also a cause of divorce. If when they contract, cruel treatment is only cause of divorce from bed and board, the legislature may declare it cause for dissolution of the marriage in all its bonds. This power is conceded by the court—it is vindicated in the past legislation of every country, savage or civilized. But it is said that the new remedy must not retroact. The legislature may impair the obligation of the contract, if it will only give beforehand due notice of its intention! We know of no other contract with which the legislature can take such liberties. The exercise of this conceded power, is totally incompatible with the idea of a contract. This court in the case of Baily v. Gentry and wife, decided a law unconstitutional, as impairing the obligation of a contract, which operated on that contract, not by lessening the principal sum due—not by reducing the rate of interest, nor yet by any other means, absolving the party from the ultimate discharge of all his responsibilities, but by refusing to let execution go for the recovery of the debt until a certain fixed period. If marriage be a contract, and its stipulations as before enumerated, each and all of its stipulations are beyond the control of legislative action. If the stipulation be contingent, and the rights which spring from it, be dependent upon the happening of a certain event—for example— the right to dower, on the event of her survivorship, the legislature cannot anticipate that event by cutting off the contingency. The contingent rights of contract are of equal sanctity with its more certain obligations. The concession must be withdrawn, or marriage is no contract. It is called by legal writers an association, a com-

AUG. TERM
1835.

The State
v.
Fry & others.

pact, a civil institution, a relation, terms not usually descriptive of other and pure contracts.

It is also we admit called a contract, but we think this proceeds from the broad and comprehensive signification of the term covering more than legal ground and from the indefinite nature of all language.

Another reason perhaps for the application of this term to the marriage relation may be found in the fact, that it was used by our law writers to distinguish it from a holy or sacred engagement.

We maintain that marriage is a relation, a great civil relation, which is affected by climate, area of country, density or sparseness of population; which regulates the public morals, and domestic manners of a people, and which therefore should vary with varying circumstances, and be controlled by the municipal law of a state. It is so called by all writers on law, and is classed with the relations of parent and child, guardian and ward, master and servant. It is said that we gain nothing by calling marriage a relation—certainly—no more than is gained by calling marriage a *contract.* The argument consists in shewing by an examination of its incidents, that marriage is not a contract, the terms of which when stipulated are unalterable by the laws of the land, but that it is a relation, which from its *very nature* must be regulated by law & be subject for the purposes of good government to the continued action of law. It is said that marriage starts in consent and is therefore a contract. This conclusion is not admitted. We do not, like the Spartans, oblige citizens to marry; nor with the Romans encourage it by the jus trium liberorum; we do not rob a legatee of half his legacy because he has no child. Manifesting less solicitude on this subject than the ancients, our law permits the natural gravitation of the sexes towards each other to regulate itself by mutual desire. It makes the association voluntary, but, as in other relations which do not arise out of consent, it creates and regulates the duties and obligations incident to it, as in the relation of parent and child and (in this country) of master and slave. Duties and obligations not only such as are deemed right and proper when the relation is created, but such also as after experience may suggest as wise to attach to it. It is further said that all contracts create in some sense relations. In some sense, every thing in this world is relative, but in legal sense are known of but four relations, of which marriage is one.

2nd, But if marriage be a contract in the constitutional

AUG. TERM
1835.

The State
v.
Fry & others.

sense of that term, we do not understand how a divorce by the legislature necessarily impairs its obligation. To release the injured party from further performance when there has been a breach of the agreement by the other is not in any reasonable view of the subject impairing the obligation of the contract." Chief Justice Marshall in the case of Dartmouth college v. Woodward before referred to speaking of legislative divorces, says: "Those acts enable some tribunal not to impair a marriage contract, but to liberate one of the parties because it has been broken by the other." 4 vol. C. R. U. S. p. 539.

The act divorcing Gentry and his wife, assigns, it is true, no reason for the divorce, but it is conceded that the legislature is not bound to assign a cause for the passage of any law. The legislature can never be presumed, any more than a court, to divorce without cause; so that the enquiry is narrowed down to the question of its power to grant divorce, *ex directo*. We grant that the legislature cannot pass a law impairing the obligation of a contract; nor can the judiciary enforce a law which does impair the obligation of a contract. The constitution limits the action of both tribunals, but it passes our understanding to comprehend how a law divorcing man and wife by act of the legislature more impairs the obligation of the contract of marriage, than a decision of a court doing the same thing. It may be denied that the legislature can divorce. Their action may be denounced as unconstitutional, if as is urged, it be the exercise of prohibited judicial power, but it cannot be pretended that the courts, admitting the power of the legislature to divorce, can set aside the act upon a hypothetical invasion of the obligation of the marriage contract.

3rd, Is the act retrospective in its operation? This question is nothing more than that which has been discussed varied only in its form. Retrospective laws whenever they retroact upon a contract, are only another term for laws which impair the obligation of a contract. They are not always synonymous however, for a law may operate retrospectively in a case in which there is no contract, as in the case of the sheriff in 7 John R. 491.

In this case there is no such distinction. · The subject supposed to be impaired is the subject retroacted on. It is the contract of marriage impaired, as is asserted in its obligation upon which the retrospection operates. We hold it too clear for argument, that if marriage be a contract, the rights, obligations and duties of which are all defined by the law existing when it is entered into, all

AUG. TERM
1835.

The State
v.
Fry & others.

subsequent law, which adds or takes away a right, an obligation or a duty, *with* or *without notice,* is retrospective in its operation. The legislature cannot escape a constitutional prohibition by making public proclamation, that they are going to violate it. To illustrate our meaning, if when Gentry and his wife married, they contracted in reference to an existing law, by which adultery was the only ground of a dissolution of the contract and that law entered into and made a part of the contract, as is urged—then we deny to the legislature the power to make cruel treatment cause of divorce, as it did in the session of 1833. The legislature cannot escape, by declaring that the law shall only operate upon acts of cruelty committed subsequent to its passage—for while these may not be retrospective upon the acts of cruelty, there is retrospection upon the contract; what is said to be fixed by the law, is thus altered by the law, and the contract made by consent of parties, and the "fixed rule of law," is changed afterwards by the law without or against consent.

The just conclusion from the premises is, that marriage in its rights, obligations, duties, and *cause* of dissolution is subject only to the law existing *at the period* of its celebration.

On the contrary we maintain that the legislature can at all times declare other causes of divorce than those existing at the time of marriage. That it can make marriage dissoluble only in death, by declaring that there shall be no divorce at all, but we ascribe this to its power over a relation, not a contract—over a relation, the obligations of which are not subject to the will of the parties, but which have their origin and their regulation in the sovereign power of a state. If, as is conceded, the legislature may declare other causes of divorce; if it may pass a general law regulating descents and distributions on the death of husband and wife, to govern as well marriages prior to, as subsequent to the act, what becomes of the argument against retrospection? The concession legalizes an evil greater than the subject of complaint. It maintains that the law which enforces the obligation of the contract, may constitutionally differ from the law which creates them. It maintains that stipulations in the bond, tho' legal when made, shall not be enforced, and that stipulations out of the bond, the mere creatures of law, shall furnish the true standard of the rights and obligations of the parties. Concessions made to save an argument from its tendencies to absurdity can never alter

a principle. They may conceal, but cannot cure its unsoundness.

But should they be withdrawn as unadvised admissions whither does the doctrine contended for lead us?

We shall have suddenly introduced among us, all those distinctions which give to the social institutions of China their complex variety. Privileged matrimonial casts answering to every modification of our laws of divorce or our statute of descents and distributions must necessarily arise, and we shall present the novel spectacle of a people whose public morals and domestic manners will depend upon the *dates* of marriage certificates! Again it is said the legislature may *separate* the parties by divorce and thus vindicate the morals of society, but it cannot touch the contract of marriage so far as the rights of property, contingent or vested are concerned. It is difficult to reconcile this admission with the position, that the granting divorce by the legislature is the exercise of judicial power, but this view of the subject will for the present be waived.

How can the distinction be supported? According to Rutherford, "each by the marriage acquires a right to the person of the other," not as is observed by this court, "as a thing to be sold like a horse," but a right to enjoyment and assistance of the other. Is this right less important, less tangible, less the object of matrimony than those incidental rights of property which the law throws around the marriage state? In savage or civilized life, this is the great paramount motive to the union, and the extraneour rights of property which positive laws confer upon the relation, originate in a design to secure its more perfect enjoyment. While the enjoyment of the person and society, constitute with the husband and wife the ruling motive, does the constitution neglect the paramount inducement, abandon to legislative encroachment, the most cherished rights of the parties, and exhaust its guaranties on subordinate and incidental considerations? Is a man less injured by a law which, overlooking the terms of the marriage contract, robs him of his wife, than by one which informs him he shall not collect her debt? Is retrospection less an evil because it operates upon a fostered and cherished immunity? Is the legislature less to be distrusted because of the importance of the privilege confided to its care? Nor can this power over the person be awarded to the legislature because of any peculiar policy justifying this nice distinction. The policy which would surrender half the rights of the marriage state,

would scarcely stickle for the remainder. , The expediency which would give up its control over the direct objects of matrimony would surrender its incidental considerations to the same discretion.    There is no such anomaly known to the law, as a contract half vulnerable and half inviolate.

While this vested right to the possession and enjoyment of the wife, is thus abandoned as within the constitutional control of the legislature, it is contended that the divorce pleaded, is null and void, because it takes away a vested right to her property.    This leads us to examine here the question.    4th, Does the act take from the husband a vested right to the property of the wife?    The property involved in the suit is choses in action of the wife never reduced, but now for the first time sought to be reduced into the possession of the husband.    It is agreed on all hands that his right to this species of property depends upon his reduction of it into possession during the coverture.    That act is a precedent condition without which his right is nugatory.    The property is never vested in him until obtained.    There is this exception to the principle that if during coverture he assign his right to her chose in action for a valuable consideration, the assignment will be protected in behalf of the purchaser or creditor, subject however to the claim, to the equitable claim of the wife, to settlement out of it. A devise of the chose by the husband would not pass the right.    Reeves' relations p. 1 to 9.

In England when the coverture is determined by death, and the husband survives the wife, he has been suffered, in the character of her administrator to collect and hold against her representatives, her choses in action, but our law is otherwise.    See the very lucid explanation of this point in the same book p. 12 to 17.    Also Revised code p. 2nd.    If he commence an action during coverture, for them, he must join the wife, and if he die after judgment and before execution levied, the property is not vested in him.    Reeves p. 126.

3rd. If during the coverture the husband, or if after it, his assigns ask the aid of a court of equity to recover the choses in action of the wife, that tribunal will not interfere except on the condition of a reasonable settlement on the wife.    2 vol. Kent's C. p. 139–140–141.

The legal import of the words, during coverture, is explained by Lord Coke 1 vol. p. 149, to mean while the marriage lasts.    When that is determined by death or divorce the power of the husband over this kind of proper-

ty ceases. It is thus seen that in no correct legal sense has the vested right of the appellant to the property of his wife been taken away. The right said to be divested was one eminently contingent, inchoate and imperfect; depending upon an event, which did not happen during the time allotted by law for its occurrence. A right too subject even during coverture to the discretion of a Chancellor. In relying upon the statute of divorce we have not sought to divest the husband of property, vested in him by the marriage. That statute only determined the coverture, and with it such rights as are lost by necessary operation of law.

We leave to those who admit, or cannot successfully deny the power of the legislature to pass laws changing the statute of descents and distributions, concerning dower and curtesy, before the death of husband or wife, the task of shewing why the same power cannot affect the interest which the husband may take in the choses in action of the wife before the happening of the contingency on which his right to them depends.

The right of the legislature to regulate curtesy and dower to abolish the jus accrescendi, in all joint tenancies, now existing or hereafter to be created, rests on its acknowledged authority over descents and distributions. See Virginia, Kentucky and Missouri statutes on this last subject.

4th, Is the act complained of an invasion of the right of trial by jury? When the constitution of Missouri was formed, she was as a territory governed by an organic law, framed by the Congress of the U. States. The inhabitants having been subject to the government of Spain, were protected in the usages and laws, which they had derived from that source—usages and laws we believe, springing from the civil law under the modifications introduced into it by the Spanish Government. The common law was also interwoven with these customs, and thus a mixed character of government was spread over the Territory. It will not be pretended that by common law the right of trial by jury pertained to divorce. To the civil law the trial by jury was unknown, and we have never learned, that any modifications of the civil law by Spain secured this valuable tribunal to the subjects of her kingdom or provinces. See Geyer's digest of laws p. 35.

The territorial government extended the trial by jury to suits instituted in courts of record, by giving to either party to the suit, the power of calling for that mode of trial, and it was made the duty of the court to cause a

jury to be impannelled. Same book p. 256. This provision we are told was subsequently modified, to embrace only cases in which the matter in dispute was of the value of twenty dollars about which parties were litigant in a court of law; and this was the state of the subject when the constitution declared the "right of trial by jury shall remain inviolate."

It is clear that the provision only applies to cases instituted in a court of law for the recovery of property or other thing to which a fixed value can be attached and has no reference to any other department of the government or any other mode of procedure than that which obtains in a judicial tribunal. When the legislature shall declare that in a suit between parties depending in a court of law, when the matter or thing in dispute is of the value of twenty dollars, the right of trial by jury shall not be allowed, it would seem to be time enough to enquire into the constitutionality of the law. It is incumbent on those who maintain the unconstitutionality of the law, divorcing Gentry and wife by act of the legislature because it invades the right of trial by jury, to shew that the framers of the constitution meant more than they have said—that while in terms, they confined their provisions to a controversy of a particular character depending in a court of defined jurisdiction, controled and governed by a judicial officer clothed with certain powers, between individuals, they intended to embrace controversies of every character, in every department of the government, no matter how constituted, either as to the mode of operation or the range of duties committed to its charge. The organic law, which had all the sanction and inviolability of a constitution, secured to the inhabitants the right of trial by jury in criminal cases, but it left the application of this tribunal to civil cases to the discretion of the law making power. How far this discretion was exercised has been seen, and as exercised it furnished the rule for the constitution—we see a striking evidence of the influence of the civil law over the legislature and convention in their provisions touching this tribunal. The trial by jury is forced upon no one: is yet open to all: and when not demanded, the court acts the double part of jury and judge. See 3rd vol. Littell p. 196. 1 Marshall 290–441.

We proceed to the examination of the only remaining ground of enquiry. Was the granting divorce by act of the legislature, the exercise of prohibited judicial power?

The clause in the constitution supposed to be violated by the act aforesaid is that which distributes "the powers

of government into three distinct departments, each of which shall be confided to a separate magistracy; and no person charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted." The "departments" referred to, are called legislative, executive, and judicial. The framers of our constitution have not the merit of originating this provision; the idea is at least as old as Montesquieu; and it is agreed that he deduced the maxim from a long and favorite contemplation of the British constitution, and delivered it as an elementary truth characteristic of that particular system. The constitution of Virginia, the first written constitution known to the world, contained the principle as an axiom in free government, and couched in terms more imperative than are to be found in ours. The sister states of the confederacy followed her example, some by incorporating in their constitutions an express provision on the subject, and all by framing their fundamental charters upon the principle inculcated. Those having express provisions on this subject are, Maine, Connecticut, New Hampshire, Vermont, Massachusetts, Maryland, N. Carolina, Georgia, Louisiana, Kentucky, Mississippi, Indiana, Illinois and Alabama, which with Virginia and Missouri make sixteen out of the twenty-four which compose our Union.

We have been thus particular in consequence of a misapprehension entertained on this subject. It is thus seen the convention which sat in St. Louis in the year 1820, in making this maxim a part of our constitution adopted a principle familiar to statesmen on both sides of the Atlantic; a principle not only to be found in the text of writers on the science of free government, but developed in practice, and practically expounded by the operation of institutions, the freest on earth, based on it as a cardinal element of the social compact. To them may belong the merit of making a new application of the principle, of attaching a meaning to the maxim, not before understood or developed in the history of free states, but they lived a century too late to claim the honor of its discovery. Whether they have adopted the axiom as it was previously understood by statesmen and jurists is a very important enquiry, in the solution of the question before the court. The principle itself has grown into a political apothegm, but its application is of inherent and acknowledged difficulty. It is agreed that no government has

21

AUG. TERM
1835.

The State
v.
Fry & others.

ever been formed without a departure from the maxim. Thus notwithstanding the emphatical and unqualified terms in which the axiom has been laid down, there is not in the constitutions of the several states, nor elsewhere, a single instance in which the several departments of power have been kept absolutely separate and distinct. The framers of the constitution of New Hampshire, the latest of the original thirteen states to form her fundamental charter, seems to have been fully aware of the impossibility and inexpediency of avoiding any mixture whatever of these departments; and have qualified the doctrine by declaring "that the legislative, executive, and judiciary powers, ought to be kept as separate from and independent of each other as the nature of a free government will admit or as is consistent with that chain of connexion that binds the whole fabric of the constitution in one indissoluble bond of unity and amity. We consider this provision not so much as furnishing a clear and definite qualification of a principle in government, as an admission of the intrinsic difficulty which attends the application of a great conservative axiom in the structure of liberal institutions. The experience offered to the world, in the practical operations of government from the year 1792 when the constitution of N. Hampshire was framed, to the period when our convention sat in St. Louis, had not solved this difficulty, or thrown new light upon the subject. That body divided the powers of government into three departments, and with looser phraseology, adopted the provisions found in the constitutions of Virginia, Georgia, Louisiana, Mississippi and other states. See the constitutions of these states.

If the terms used in our constitution, can be construed to mean any thing more than a personal disqualification by which it is declared that no legislator shall be a judge or executive officer, and vice versa, it would seem that the qualification of the principle is to be found in the words, "properly belonging" a question to be decided by no new standard, but depending for its solution upon the happy adjustment of a problem which has as yet puzzled the wisest statesmen and jurists of modern times.

In practice there can be but little gained by the clause, and it is this consideration we imagine, which accounts for its omission in the constitutions of Ohio, Pennsylvania, Delaware, South Carolina, New York and New Jersey. All these constitutions are framed upon the maxim of a necessity of the distribution of powers into departments, legislative, executive and judicial—so, that the

omission of the usual preliminary clause of distribution, must be accounted for on some other ground, than that their framers were insensible to the importance of the principle involved in it. The XLVII number of the Federalist from the pen of Mr. Madison, was written expressly to vindicate the Federal constitution from its supposed violation of the political maxim under consideration, and that instrument like those just referred to contains no distributive clause. Federalist p. 260.

There is nothing on the face of our constitution to show that its framers had any other view of this maxim, than was entertained by those who had gone before them. They adopt no new provisions but such as were ready made to their hands; and unless all settled rules of construction be disregarded, they adopted them *in the sense in which they were understood at the time of their adoption.*—Not only has it been found a difficult problem to determine how much legislative power should in free governments, be given to the executive department—how much judicial power to the legislative department, and how much executive or legislative to the judiciary department; but the precise boundaries which separate and distinguish those powers one from another, have never been accurately surveyed and defined. There are powers necessary, for a government to exercise, which it is difficult to class under either head; because partaking of the nature of more powers than one; and there are others of which it is hard to determine whether they be legislative, executive, or judicial. The very terms used by the Convention, *"properly* belonging," whether they refer to the *admixture* of the powers of government, among the departments, or to *the nature* of the powers themselves, are a concession to this argument. They admit that powers may exist, ambiguous in their character, which may be ranged under more than one department of the government, and which are of doubtful classification.

By what standard these doubts and ambiguities are to be removed, we are uninformed, and left to rational conjecture to determine. We see that the departments of government are three in number, legislative, executive and judicial,—we see the powers of the government, divided amongst these departments, but not according to their nature, on the contrary we see the legislative department clothed with judicial powers, the executive department with legislative powers, the judicial department with executive powers; and then it is declared not as is declared by the Virginia constitution "that neither department

shall exercise the powers, properly belonging to either of the other departments, nor shall any person exercise the powers of more than one of them at the same time, except that the justices of the county courts shall be eligible to either house of assembly," but that "no person charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted." Now in this search into the abstract nature of powers, legislative, executive and judiciary, what guides must we follow?

Must we follow Montesquieu, Burlamaqui, De Lolme, Neckar, Rousseau, or which, or either of them, for they all differ? Or must we solve our enquiries by reference to these powers as they are understood in France, in Russia, in England, or in the United States? Unhappily for us, there is the same division among nations on this subject as among writers. In this country whenever a constitutional discussion has turned upon the abstract nature of the powers of government, we have seen exhibited the same difference of opinion among statesmen and jurists the most distinguished. We could instance the question "whether the power of removal from office is in its nature an executive or legislative power?" a question once determined in Congress by the casting vote of the Vice President, and since revived by the Senate of the United States. Other examples might be cited, but the statesmen of this country, aware of the difficulty which ever attends investigations of this character, and deeply impressed with the danger of deriving power to any department of government, by an investigation of its abstract nature, have in a great measure destroyed the evil by a specification of powers in the fundamental charter. Thus to ascertain what power, by the constitution, belongs to the executive department, you wander not in the undefined regions of executive power in the abstract, but look to the specific grants of authority contained in the instrument, and so of the other departments. The legislative department being less susceptible of precise limits its powers are always negatively defined, and since it results as a consequence from the unavoidable want of specification, that questions will frequently arise of real nicety whether the operation of a particular measure will or will not extend beyond the legislative sphere, this department is subject to much more direct responsibility to the source of all power, than either the executive or judiciary.

The judiciary department is the simplest of the three, and is therefore described by land marks the most certain. If despite their caution, some questions of constitutional law are still left to be determined by an examination of the abstract nature of the power, it results from the imperfection which attends the best of human institutions. Divorce is claimed to be in this State a flower of the judiciary. It is said to be in its nature judicial and to involve the exercise of only pure judicial powers. On these grounds it is pronounced that the act of the legislature in question was an encroachment upon the judiciary department of the government, and a violation of the constitution, and yet it is admitted that "no reason is seen why the act shall not operate as it declares it shall act, so as to free the parties from the pains and penalties of a second marriage." "It is also admitted as probable that with the consent of parties, the legislature may authorize the parties to live separate and apart, and even to marry again." But the right of property fixed and vested by the marriage, would it is said remain fixed and vested.

Now the consent of parties can never change the nature of the power exercised over them, nor we may add, legalize what is in its nature forbidden. If the legislature can separate man and wife, and permit them to marry other parties, it can divorce them, for these acts constitute the definition of divorce a vinculo matrimonii; unless indeed, divorce partakes of a twofold character, partly legislative and partly judicial. Legislative so far as the person and the bond of matrimony are concerned—and judicial so far as the incidental rights of property are concerned.

And even if this be so, the co-operation of both departments would be necessary to the validity of the divorce. The judiciary could not separate the parties, because that act would involve the exercise of legislative power. The admission in our view, is irreconcilable with the position, that divorce by the legislature is the exercise of prohibited judicial power; and we have already endeavored to show that no fixed or vested right to property was taken away from the appellant, by the act which separated him from his wife. But if divorce be a prerogative of the judiciary, properly and exclusively so, it is a remarkable error in all past and present govments, that it should not be so found or acknowledged. We have no knowledge of any country in which the judiciary is the exclusive depository of this power—or of

AUG. TERM
1835.

The State
v.
Fry & others.

any writer who treats it as of purely a judicial nature. Hoffman in his legal outlines, in the studied and guarded language of a definition, declares that "a law which divorces A. from B. is as much a law, as an act which forbids the exportation of corn." In England the ecclesiastical courts have a limited power over the matter of divorce, indulged to them, in the language of Hale, "pro reformatione morum, et pro salute animæ;" a power denied to every other judicial tribunal in that country, and vested in its full extent in the legislature. These tribunals pass, what are termed sentences, and obedience to them is enforced against the contumacious, by their holinesses only thro' the terms of an excommunication. Upon a signification thereof into chancery a writ of excommunicato capiendo, goes out; whereby the party is imprisoned till obedience [is] yielded to the sentence.—See Hale's Common law p. 30.

It was settled in the Duchess of Kingston's case that the spiritual courts have no jurisdiction directly, or indirectly, in any matter not altogether spiritual; and that all the powers, the judicial powers, with which they were clothed, were addressed to the conscience of the party. Ib. 36, and 47. See also Thomas' Coke 1 vol. p. 146. N. E. 4 Bacon 556.

Their utmost power in case of a legal marriage, is a separation from bed and board. Parliament only can dissolve the bonds of matrimony.

Under the British constitution, then, which, to use the language of Mr. Madison, "was to Montesquieu, what Homer has been to the didactic writers on epic poetry," and from the study of which, that great political critic, deduced the elementary maxim, of a distribution of the powers of government into three departments, divorce is considered, not a peculiar flower of the judiciary, but an "indulgence," granted to a quasi judicial body, engaged only in spiritual things; an indulgence flowing purely from a deference to the Hierarchy, which is hostile to the nature of our institutions. It belongs to the legislative department of the government, subject to such regulations as a proper regard to the public morals and domestic manners of the country may impose.

In the United States, under the constitutions of the several members of the confederacy, the same disregard has been manifested to the claim set up in favor of the judiciary, to exclusive cognizance over the matter of divorce. In Virginia, Maryland, Delaware, Georgia, Tennessee, South Carolina, Alabama, Louisiana and Missis-

sippi—divorce cannot be granted by the judiciary; but is exclusively granted by special act of the legislature. In the remainder it is granted, sometimes by the judiciary and sometimes by the legislature; the courts acting by virtue of laws, clothing them with power to divorce in certain cases; and the legislature through its unrestrained sovereign power over the subject. Following in this particular the practice of the English constitution, which gives to the judiciary a limited control.—2 vol. Kent, 105.

Chancellor Kent informs us, "that for many years after New York became an independent State, there was not any lawful mode of dissolving a marriage in the lifetime of the parties, but by a special act of the legislature." He adds: "this strictness was productive of public inconvenience, and often forced the parties, in cases, which rendered a separation fit and necessary, to avail themselves of a more easy and certain remedy." 2 vol. commentaries p. 97.

After a review of all the authorities on the subject, the same distinguished jurist says:—"assuming therefore that in ordinary cases, the constitutionality of the laws of divorce, in the respective states, is not to be questioned, the embarrassing point is to determine how far a divorce in one state, has a valid operation in another." 2 vol. p. 107.

"If," says the same author, "however a marriage in N. York should be dissolved, not by a regular judicial sentence, but by an act of the legislature in another state, passed especially for the purpose, and for a cause not admissible here, would such a divorce be received here as binding? A statute, though not in the nature of a judicial proceeding, is a record of the highest nature; and in some of the states all their divorces are by special statutes. But if a statute though a matter of record, was to have the same effect, in one state as in another, then one state would be dictating laws for another, and a fearful collision of jurisdiction would instantly follow. That construction is utterly inadmissible. While it is conceded to be a principle of public law, requisite for the safe intercourse and commerce of mankind, that acts, valid by the laws of the place where they arise, are valid every where, it is at the same time to be understood, that this principle relates only to civil acts founded on the volition of the parties, and not such as proceed from the sovereign power."

"But," he adds: "if instead of a divorce by statute, ex

directo, the act should refer a special case to a court of justice, with directions to inquire into the fact and to grant a divorce, or withhold it as the case might require; would that be a judicial proceeding, to which full effect ought to be given." From all which we think it clear, at least in the opinion of the author, that divorces granted by the states are constitutional; that when granted by the legislature ex directo, they are not judicial proceedings, that they do not involve the exercise of judicial power, but are emphatically laws flowing from the sovereign power, and as such are valid only in the limits of its territory.—2 Kent p. 117 and 118.

In Virginia, in the case of Purcell v. Purcell 4. H. & Munford p. 507. a chancellor, claiming to possess by the adoption of the common law, all the power over divorce, possessed in England by the ecclesiastical courts, allowed alimony, "until the husband shall restore the wife to the comforts of her bed and board, and give satisfactory assurances for her enjoyment thereof." An appeal from the decree was asked, and refused by the court of appeals, who thus sanctioned the power exercised; but this is the only effect ever made in that state by the courts. And Judge Tucker adds: "doubts having always existed as to the judicial power over the subject—applications for divorces a vinculo matrimonii are usually made to the legislature."—Tucker's notes, Book 1st p. 440.

In the case of Borden v. Fitch, 15 John. p. 145—the supreme court of the state of New York, set aside a divorce obtained in the court of Vermont—obtained by fraud and false representations—and sustained a divorce granted by the legislature of Connecticut.

We have been referred to the constitutions of Georgia, Mississippi and Alabama, as having express provisions on the subject of divorce. It is granted that there are express provisions on the subject; but we marvel at the inconsequence of the conclusions drawn from them.

If any inference would seem to be clearer than another from the premises, it i that without them, these constitutions contain no prohibition against divorce by the legislature, and that with them, it is not the exercise of judical power. It will be recollected that each of these constitutions contains a clause of distribution of the powers of government into three departments,—legislative, executive and judiciary; each to be separate and apart from the other, and confided to a separate magistracy—and no person or collection of persons, being of one of those departments, can exercise any power properly be-

longing to either of the others, except in the instances expressly permitted .The express provisions referred to, declare "that the legislature shall not grant divorce until the parties have had a fair trial in the superior court," and then only by a vote of two thirds of each branch of the legislature. We think it most manifest that without this prohibition, the legislature could have granted divorce, by the majority necessary to pass any law, and without previous finding of facts, by any tribunal, other than one of its own committees. And as to its being with it, a judicial proceeding, the idea is utterly opposed, by the absolute necessity of legislative power to the grant of divorce. ;

We have seen, that chancellor Kent considered it an embarrassing question, to determine in the case of a reference, by special act of the legislature, to the judiciary, with a given power to that tribunal, to grant, or withhold divorce, as the case might justify, whether such would be a judicial proceeding.

The only office performed by the judiciary in these states, is to institute an enquiry preliminary to divorce. It furnishes in place of a committee, the facts upon which subsequent legislation is based, but it neither can, nor does, grant divorce. These provisions may be vindicated, as wise and judicious; they may be regarded as furnishing a better mode for the investigation of the causes for which divorce is granted, but they are extremely unfavorable to the doctrine which makes divorce a flower of the judiciary.

But whether wise, or unwise, they have not been adopted by the framers of our constitution, and we think it an inverted method of reasoning to apply the deductions drawn from the existence of certain provisions in an instrument, to a case in which no such provisions are to be found.

In England then, and in America, we have not found divorce regarded, as of purely a judicial nature.

In the investigation which we have made concerning the abstract nature of judicial power, we have found no writer who treats divorce as properly of judicial cognizance. What light shall we yet follow—to what country shall we yet look, to furnish in its precepts or examples, a surer guide to the developement of the political question we are investigating? We confidently assert that no country can be found, in which the legislative power over the subject of divorce has ever been questioned. This concession seems to be readily made.

22

It is admitted that all the states of the Union from the earliest period of their existence up to the present time, with constitutions similar to our own,—fifteen of them containing the very clause, supposed to be violated, and all of them framed on the principle inculcated by it; have acted upon the idea, that the clause contains no prohibition upon the legislature to grant divorce. It is also admitted that the judiciary of the states have not deemed the action of the legislature an encroachment upon their constitutional power.

But while these admissions to the uniform and concurrent action of independent and separate states, for the space of half a century, are granted, it is denied that the authority is sufficient to determine what construction ought to be put on the terms "judicial power" as found in the constitution.

In the absence of a single adjudication of any court or the example of any country, to the contrary, we regard these admissions as of the utmost importance in the determination of the question. We know of no better method of ascertaining the abstract nature of the powers of government, than to look at the uniform practice of all governments in relation to them. And when to this rule of construction we bring the practice of a people jealous of their rulers—watchful of encroachments on their fundamental charter, and fond of liberty, we cannot but regard the prohibition as latent indeed, which should so long escape detection.

It is said to be no more remarkable, "that this question should now for the first time be raised in Missouri, than, that questions concerning bills of credit should have remained dormant in the several states, from the time of the adoption of the Federal Constitution in 1789, till the year 1824,—when it was first raised in Missouri." We cannot agree that there is any analogy between the cases. If to this state belongs the credit of mooting the constitutionality of Loan Office certificates, she is also we believe, entitled to the exclusive honor of originating Loan Offices. And these state machines had been in operation only a year or two, when, in the natural order of cause and effect, payment of notes, executed for certificates, was resisted in courts of the country, on the ground that the certificates were bills of credit in the sense of the constitution. To make the cases parallel, all the states of the Union from the respective periods of their entering into it, should have issued Loan Office certificates. The state and Federal judiciary should have

acquiesced in the practice during the same period, and writers distinguished should have pronounced in favor of their validity. Missouri the last of the states to enter into the confederacy should have only followed their example,—organized her Loan Office, and issued her certificates, when for the first time, in the year 1824,—the courts should be startled by the novel defence. We feel confident in the assertion, that no instance can be furnished in the annals of our jurisprudence in which a practice so ancient, and uniform, and a construction so universal and contemporaneous, as that, on which we rely, has ever been overthrown by any judicial tribunal in our country, state or Federal. In the celebrated case of Dartmouth College v. Woodward; Chief Justice Marshall, asks for some sentiment delivered by contemporaneous expounders of the constitution, "upon which he might base a safe and intelligible exception, to the apparent import of that instrument."—See 4. Wheaton p. 518,—and the same distinguished Judge in the case of McCullough v. The State of Maryland, "scarcely considered the question of the power of congress to incorporate a bank, an open one, after the proceedings of our nation concerning it." "It is conceived that a doubtful question, one on which human reason may pause and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice.

An exposition of the constitution, deliberately established by legislative acts, on the faith of which an immense property has been advanced, ought not to be lightly disregarded." 4. Wheaton 316.

If it were a case of the first impression however, uninfluenced by the practice of the government from its earliest history we should still regard the act of divorce, as reconcilable with the constitution. So peculiar is the married relation, so intimately connected is it with the public morals of a people—so impossible is it to foresee all the causes which should impel a separation of the parties—so difficult is it to provide for them—so incompatible is it with the idea of judicial power, in a free government to clothe it with a general discretion to make a remedy for every case which may arise in the constant vicissitudes of human society, and so necessary is it, that some where in the system there should be a power capa-

ble of doing this, that special legislation suggests itself as the best, the only remedy for the evil. It is impossible to account for the uniform practice of all governments on the subject of divorce, or any other hypothesis.

Whether this special legislation should proceed ex directo, or whether as is suggested by chancellor Kent, it should refer a case to the judiciary, with power to grant or withhold divorce as the case might j ustify, ( a power, let it be observed, which he does not even question) is a matter to be decided by the relative expediency of the two modes of action; but the question to be decided, is one of expediency, not power.

But we proceed to a view of this subject, which unless we greatly mistake its force, is conclusive of this question.

When the convention which formed our constitution in St. Louis, in the year 1820, and incorporated the clause of distribution of the powers of government into that instrument, they adopted a provision ready made to their hands. They knew, that this provision ·had been practically expounded by all or nearly all the states, to contain no prohibition to legislative action over divorce. They saw states with and without this clause, in the constant habit of exercising this power. They had seen an uniform acquiescence in this construction by the judiciary of the several states, and by the people. They had seen this power exerted every where in the United States, and denied no where. Did they not adopt it in the sense in which it was then universally understood? If they had meant to deny to the legislature the power of divorce, would they not have inserted an express provision in the instrument? If restriction on the legislative power, over the subject, had been by them intended, would they not have manifested the caution and solicitude of Georgia, of Mississippi and of Alabama, by placing those restrictions on the face of the constitution in express terms of a prohibition? We think candor compels an affirmative reply to these questions.

It is in vain that you appeal to the language of the clause of distribution to the terms, "judicial power." This is the very language, these are the very terms which have been expounded. We are not aware of having denied, that this convention "had some tolerably definite idea in their minds of what they intended should be understood by the legislative and judicial powers;" we grant this, in the fullest extent, and insist also that they had some tolerably definite idea of the rules of construc-

tion by the use of which their work would be expounded.

Among these rules of construction, is the cardinal one, that when a provision, or law heretofore known, and understood, is adopted, this provision or law is adopted in the sense in which, at the time of adoption, it was understood. Take for example, out of the many illustrations which might be cited, the 3d section of our statute on wills and testaments 2. vol. R. C. 790.—It declares that, no will or codicil, or any clause thereof, or any devise or bequest therein shall be revoked, except in the manner therein pointed out.

Marriage subsequent, and the birth of a child is not mentioned in this section as a mode of revocation. Yet where is the jurist in the country who would not admit, that these acts amount, despite the language of the statute, to a revocation of the instrument? The reason of the rule is, that our section is a literal transcript of an English statute, which when adopted in our statute book, was not understood to apply to implied revocations.

This court has heretofore not been insensible to the force of this reasoning. In the case of the State v. John Simonds, it grounded its decision on similar views.

Simonds was indicted for keeping a Roulette table. He pleaded a former fine and conviction for the same offence, before Wilson Primm a justice of the peace, for the county of St. Louis, which conviction took place, under the authority of the corporation of St. Louis. A demurrer to this plea was overruled by the circuit court, and upon judgment rendered in behalf of the defendant, the case was brought before this court. The point made in behalf of the state, was, that by the constitution, all legislative power is granted to, and vested in a general assembly, and that the general assembly could not create a corporation, vesting it with legislative powers, as had been done in the organization of the body-corporate of the city. This court agreed that, in the language of the constitution, all legislative power, was granted to and vested in the general assembly, as also, that the corporation of the city was vested with legislative powers—but it maintained the constitutionality of the laws of the corporation. The reasons for the decision shall be given in the words of the court. "In the first place, we assume it as true, that no city of any size can at all get along without this power. We admit that the necessity of the case does not of itself form a sufficient reason why the power should be exercised if it is not given, or if it is denied.

But it does form a reason why the power should not be denied, unless clearly denied. At the time the constitution of this state was formed, the town of Saint Louis was incorporated with nearly similar powers to those now granted. The constitution was formed in the town. The convention sat and formed the constitution in the bosom of the corporation—saw its effects and operations daily, yet they have no where any prohibitory words regarding its powers or existence. But on the contrary, they have said and declared in 2d section of the schedule to the constitution,—that all laws in force in the territory which are not repugnant to this constitution, shall remain in force until altered or repealed. Not only the act incorporating the town as above mentioned was then in force, but there existed in the statute book of the territory a general law authorising the county courts, of every county, to incorporate the several county towns, when required by petition so to do. "If this power, as it then was known to exist, had been intended to be expressed by the convention, when they declared, all legislative power should be vested in the general assembly, they surely would have used some words more clearly leading to the subject than they have. We might expect an express prohibition. But so far from any thing express on the subject, by way of prohibition, they seem to have sanctioned the idea of the right and power of the legislature to create such corporations as the city corporations. The 5th sec., of the 13th art. declares that no religious corporation can ever be established in this state. We are of opinion that under the foregoing view of the question, that the power to create lay corporations, and corporations with powers to legislate in regard to the police of cities &c., is clearly to be implied."* It is obvious that the stress of this decision is placed upon the absence of any terms of prohibition, other than that all legislative power shall be vested in the general assembly.

For in regard to what it said about the terms of the schedule concerning the laws in force in the territory, little can be gained to the argument from that source. No laws are of force, under the schedule, which are repugnant to the constitution, and what laws are repugnant to the constitution, is left an open question. But if the argument is legitimate, it would equally prove that divorce laws are constitutional, for they were likewise of force and recorded in the statutes of the country.

A similar remark applies to the argument drawn from

*Not reported.

the 5th section of the 13th article of the constitution. Religious corporations are prohibited, it is true, and the inference is certainly correct, that lay corporations may be created, but that a lay corporation may be created, clothed with legislative powers, is a conclusion we submit, too broad for the premises.

The power of the legislature to incorporate a rail road company, a steam mill company, a college or other literary institution, has never we believe been questioned,— and the question before the court was, not the power of the legislature to make a corporation, but to endow it with such legislative powers as would make its enactments, part of the criminal code of the country. We think it easy to show in the above case the danger which would have resulted to the country, from a rigid adherence to the abstract nature of legislative power, and the terms organizing the legislative department, and a like course of reasoning on the same term in the clause distributing the powers of government into three departments, would throw this government, and these United States into inextricable confusion, by proving the unconstitutionality of the common law itself. See on this subject, the essay on Codification, by Sir Samuel Romilly, reported in the 6th number of the Jurist p. 36. Also Sampson on the common law, p. 111, for an essay by George M. Bibb,—also same book, p. 104, for an extract from the message of De Witt Clinton to the legislature of New York.—Same author p. 103,—for the message of Gov. Wilson to the legislature of South Carolina, and the observations of the same writer in a letter to Wm. Sampson; also, p. 102, for the remark of Chief Justice Saunders,—same book p. 91.

It is thus seen how very easy it is, by an artificial argument, which wanders in the undefined regions of power in the abstract—to break down that very clear distinction "of which counsel speak, between the making of a law and passing a sentence?" It is seen how readily a common law judge may be converted into a legislator—how the common law itself, can be made hostile to the nature of our institutions, and a violation of our fundamental charter. We reject the conclusions of these very distinguished jurists and statesmen, and adopt with Du Ponceau, the sentiment, that, "we live in the midst of the common law, we inhale it at every breath, imbibe it at every pore, we meet it when we wake, and when we lie down to sleep, when we travel and when we stay at home; it is interwoven with the very idiom that we speak;

and we cannot learn another system of laws, without learning at the same time another language." We reject them because the reasoning on which they are founded is the operation of the rectangle and the square, which never fit in with the irregularities of human transactions; because it surrenders too much that is practical, to what is abstract and theoretic,—because it gives language a construction, of which it is perhaps susceptible, but which we believe foreign from the intention and signification, in which it was used.

We at the same time respectfully dissent from the conclusion to which a majority of this court arrived, thro' what to us appears a similar course of reasoning, on the former argument of this case; whether a conclusion thus reached will ever justify a court in declaring a law passed by the popular department of the government, unconstitutional and void, will be seen by a recurrence to the following sentiments uttered by jurists, alike distinguished for judicial learning, and for judicial firmness. "The question, whether a law be void for its repugnance to the constitution," said C. J. Marshall, in the case of Fletcher v. Peck. 6 Cranch 88—"is it at all times a question of great delicacy; which ought, seldom, if ever, to be decided in the affirmative in a doubtful case." The opposition between the constitution and the law, should be such, that the judge feels a clear and strong conviction of their incompatibility with each other. And in the Dartmouth College case, in which the same judge asked for some cotemporaneous exposition of the constitution by its founders, to resist the conclusion to which he was arriving,—he again remarks, "on more than one occasion this court has expressed the cautious circumspection with which it approaches the consideration of such questions; and has declared that in no doubtful case, would it pronounce a legislative act to be contrary to the constitution." In Calder v. Bull 3, Dallas 386—it is said by the late justice Chase, "if ever I exercise the jurisdiction I will never decide any law to be void but in a very clear case." And by the late justice Iredell in the same case "the court will never resort to that authority but in a clear and urgent case." And in Cooper v. Telfair, 4 Dall. 14,—by the late justice Patterson, "to authorize this court to pronounce any law to be void, it must be a clear unequivocal breach of the constitution, not a doubtful and argumentative implication." In the case of Craig &c. al, v. the State of Missouri, the late justice Johnson delivered himself as follows: "The result is that these cir-

tificates are of a truly amphibious character; but what then should be the course of this court?

"My conclusion is, that as it is a doubtful case, for that reason, we are bound to pronounce it incorrect. It does indeed approach as near to a violation of the constitution as it can well go, without violating its prohibition." And judge McLean in the same case, says, "the power which declares it (the act creating Loan Offices) null and void, should be exercised only when the right to do so is perfectly clear." We hope never to deny to the judiciary, the power of deciding a law to be unconstitutional.

The right so to do follows inevitably from its duty to declare what the law is;—and was vindicated by C. J. Marshall, in the case of Marbury v. Madison, by arguments which human reason cannot overthrow. But while we concede the power, we must insist, that it is not by occupying all the debateable ground of the constitution, it is not by claiming all the disputed territory of power, that the judiciary will maintain its rightful supremacy, or bear its intended part, in the maintenance of constitutional liberty. It is apprehended, that a decision supporting the act of the legislature, in this case, will place in the power of that body contracts of every character,—will clothe it with authority to examine into every breach of the same, and to declare the forfeiture; will in effect deny to the judiciary its rightful authority and its peculiar province, to render judgments, sentences and decrees between parties. But is the apprehension well grounded? If marriage be a contract, what other contract is marked by such peculiarities? Over what other contract, can the legislature exercise the power, which it may confessedly exercise over this? What other contract is there, which by the practice of so many governments, despotic and free, is found subject, either to the exclusive control of the legislative department, or to the concurrent action of legislative and judicial powers? In relation to what other contract can a uniform and contemporaneous construction be relied on, as subjecting it to the uncontrolled action of legislative authority? The practice of half a century, which gives to the legislature, power to dissolve the marriage tie, denies it the power to dissolve every other contract. The judiciary of every state, which quietly witnessed the dissolution of marriage, by the direct action of its co-ordinate department, has been sensibly alive to every encroachment upon its power, when other contracts have been the subjects of violation. While jurists and statesmen, the ablest, have

23

AUG. TERM
1835.

The State
v.
Fry & others.

ever supposed marriage to be within the power of the legislature, they have ever maintained that other contracts are without it.

It seems to us to require no ordinary degree of intrepidity to assert, that these marked distinctions are without shadow of reason, and that they cannot furnish an intelligible line of discrimination, for the guidance of the judgment of this court. We will not again press the mischief which must unavoidably follow the decision of the court as heretofore rendered in this cause. They are felt and regretted by the bench, and we know, that whatever may be the evils attendant upon an adherence to that decision, they will be evils, not of choice, but necessity, a necessity as painful as it is imperative."

Opinion of Judge McGirk.—The act of the General Assembly granting the divorce is unconstitutional, —and the plea bad.

I will now proceed to give my view of the question before the court. I think the question arising in this case may be fairly considered under the following heads. 1st, Does the relation and state of marriage exist under such a contract as is contemplated by the 17th section of the 13th Art. of the constitution of the state. Or in other words does the act of the general assembly, in question, impair the obligation of a contract? 2nd, Is the granting a divorce by the general assembly, the exercise of a judicial power, so as to be within the prohibition contained in the second article of the state constitution?

As to the first point many authorities have been cited to shew that marriage is nothing more than a civil contract. I am of opinion this doctrine is correct. A contract is defined to be a promise made by one person who is able by law to make a promise to another person who must be capable in law to receive such promise, to do or forbear to do a certain particular thing, or it may be to do or to forbear to do several things. To this point see 2 Bl. Com. 442. Powell on contracts p. 6. Mr. Powell after giving the common law definition of a contract, and the definition given by writers on general law, gives his own definition, which seems to be extremely simple, comprehensive and clear. He says a contract is a transaction in which each party comes under an obligation to the other and each reciprocally acquires a right to what is promised by the other. A hundred other authorities both on natural and common law, might be cited, all concurring to shew that a contract is nothing more in substance than as above stated.

I will now enquire whether the marriage state exists under a contract of the parties, or whether it exists as a mere relation imposed on them by the general force of

the law. The counsel for the defendants, mainly predicate their defence on the ground that marriage produces between the parties, a mere civil relation and that the contract or agreement by which persons become married is not a civil contract within the meaning of the constitution of this state, which declares no law shall be made, impairing the obligation of contracts. The best law writers we have any knowledge of view the contract of marriage as a purely civil contract. Blackstone in his first volume p. 448, says, "Our law, (i. e. the common law of England which is made the law of this state by an act of the general assembly of 1815 and 1825,) considers marriage in no other light than as a civil contract, and viewing it in this civil light, the law treats it as it does all other contracts, allowing it to be good and valid, in all cases, where the parties at the time of making it were in the first place, willing to contract, able to contract, and actually did contract in the proper forms and solemnities required by law."

Rutherford in his Institutes of natural law 2 vol. p. 282 says, "The only difference between the contract of marriage and any other contract is, that other contracts though they are valid from the beginning, may be rescinded or made void afterwards by subsequent civil law which forbids performance—whereas when a marriage is solemnized in such manner as to be once binding, no subsequent civil law, which forbids its performance can rescind it, consistently with the natural and revealed law of God, which has made this contract perpetual, &c." This passage is only cited to shew that marriage is considered in the light of a civil contract. And he says page 335. "Now the ends of marriage are the mutual happiness of the parties and the production of children.—We are therfore to enquire what sort of contract these two ends require." The author then goes on to shew that to accomplish these ends, coupled with the education of children, the contract should be perpetual in its obligation. In page 337 he views the parties as giving to each other a right in the person of each.

As to this point that marriage is viewed as a civil contract, see 1 Kent com. 391. 2 do 65–75.

The argument of the counsel is that marriage is a civil relation and so viewed by our Law. It is admitted that marriage is a civil relation. But it does not follow because marriage is a relation, that it is not also a matter of contract. Judge Blackstone in the first volume of his commentaries 422 says, "the three great relations of pri-

AUG. TERM
1835.

The State
v.
Fry & others.

vate life are, 1st, That of master and servant, which is founded in convenience whereby a man is directed to call in the assistance of others where his own skill and labor will not be sufficient to answer the cares incumbent on him. 2nd, That of husband and wife, which is founded in nature and modified by civil society. The one directing man to continue and multiply his species, the other prescribing the manner in which that natural impulse must be confined and regulated.

3rd, That of parent and child, which is consequential to that of marrage, being its principal end and design, and it is by virtue of this relation that infants are protected, maintained and educated."

The author then shows how these relations are created, that of master and servant is, he says, created, as we know the fact to be, by contract. By servant, the author means a person hired to labor. That of husband and wife, is also by virtue of a contract. That of parent and child grows out of the enjoyment of the marriage contract, and the duties imposed, arise by force of law. Thus we see that the two first of these relations, are expressly created by contract, yet they are relations. Indeed it seems that almost every contract that can be thought of, creates a relation of some sort, between the parties contracting. If men make a covenant, they stand in the relation to each other, of covenantor and covenantee. So in the case of copartnership. I think the foregoing clearly shews, that nothing can be gained by calling marriage a civil relation. It is so and arises by a contract of the parties.

I will enquire for a few moments, into the rights acquired by the parties respectively by reason of this contract.

First, each acquires a right in the person of the other, not as a thing that can be sold as a horse, but a right to the society and assistance of the other.

Rutherford, in his first volume of natural law, p. 314 says, marriage is a contract between a man and a woman, in which by their mutual consent, each acquires a right in the person of the other for the purposes of mutual happiness and of the production and education of children. Each acquires a right that the other shall be continent, and each will endeavor so to demean him, or herself, that the ends proposed by the marriage shall be accomplished. It follows therefore, that if either commit adultery, or treat the other with cruelty, the contract is broken, and the injured party has a right by the law of nature

and by the laws of most civilized countries, to consider the contract at an end, and has a right to apply to some public authority of the state, to render a decree by some public solemn act, that the contract is at an end. This forfeiture is in some respects like a forfeiture in other cases of contract, it releases the parties from the farther execution of the contract and gives the injured party such other relief as the nature of the subject will permit and the laws of the land have provided for. In addition to these rights, which are mutual, the law as it now stands has seen fit to throw upon the parties respectively and vest in them, in some cases other rights and benefits, privileges and advantages which are not entirely mutual. In the first place, the wife by the marriage [is entitled] to the protection of her husband, against unlawful violence, from every quarter. She is entitled to a maintenance out of her husbands estate, suitable to her degree and situation in life. 1 Bacon's abridgement 488.

She is entitled to have the children she may have by him, maintained and educated out of his estate. 1 Bl. 446–7. She is entitled to be tenant in Dower of all the real estate he is seized of during coverture, with some few exceptions. That is, she is entitled during her life to the enjoyment of the one third of these lands if she outlive her husband. In case the husband leave children she is entitled to one third of the personal estate absolutely, if no children, then to half, besides in this latter case, to all the slaves, that came to the husband by her.—See R. Code 332. These are the principal advantages on the part of the wife. On the part of the husband he is entitled to all her personal property whether in possession or not at the time of the marriage, as his own property, reduces those things which are not in possession at the marriage into possession during the coverture. 1 Bac. Abr. 479–80. He is entitled to the use and profits of her real estate, during his life and no longer. 1 Bac. 476, Blac. com. 126.

He is entitled to all the debts due to her, and is liable to pay her debts. These are the leading advantages to the husband.

Thus we see, what the contract is; that it is a civil contract, creating rights in the respective parties, as well as duties and obligations. We see what the contract is and also the advantages secured to the parties by it. The 17th section of the 13th article of the constitution of the state, declares that no ex post facto law, nor law impairing the obligation of contracts can be made. It is insist-

ed that this contract is not embraced within the meaning of the prohibition—because a fair interpretation of the spirit of the act must have been intended to relate to pecuniary contracts alone. We have seen what a contract is. Now it is clear, the words used in the constitution are large enough to, and do embrace every thing that is entitled to the legal definiton of a contract.

This contract must be within the prohibition, unless there is something in the nature of the subject, which would in equity and the nature of the thing, take it out of the provision. In this case, no such equity nor necessity has been shewn, nor is it believed that any exist. If it is constitutionally true that no law can be passed to impair the obligation of a contract to pay money, to build a house, or dig a ditch, why ought it to be less true that a law cannot be passed to deprive a person against his consent, of the rights accruing to him by the contract of marriage. If A. promise to build a house for B. and fail to do it, can the legislature of the state say he is not bound to build the house, nor pay damages for the failure? If they cannot do this, how does it happen, they can upon any principles known to reason and sound logic, declare that the wife, who was B.'s shall no longer be his, and that the parties are henceforth discharged from all obligations toward each other, to fulfil the duties by them contracted to be fulfilled. An answer is attempted to be given to this proposition which I think is no just answer. It is this, that marriage is of a character highly municipal, and that society cannot exist, without a power some where in a state to divorce married persons. It is agreed that marriage is highly municipal in its character. That is, the law of the land must declare who can and who cannot marry. It must define what words, ceremonies and forms are requisite to form the contract.

It must declare the rights and duties of the parties, and lastly, it must declare what shall be the consequences to the parties, in case of a failure to comply with the contract. It is also agreed that in every well governed state, there should be a power to divorce, or rather to release the injured party from the other, who has broken his contract. But to release the injured party from farther performance, where there has been a breach of the agreement by the other, is not, in any reasonable view of the subject, impairing the obligation of the contract; but is rather providing a remedy by which some compensation is made for the failure to obey the obligation of the agreement. But again, this answer goes too far. Is it not

equally true, that every contract is also highly municipal? Must not the law of the land declare who can make a contract to dig a well, and what rights the parties shall respectively have, in case this contract is either fulfilled or broken? In the one case the operator has a right when he complies with his agreement,—to have a compensation. In the other, the owner has a right to the use of the well, and in case of a failure by either, the other has a right to insist on a compensation for the failure. Now all contracts are matters of municipal regulation, and the constitution certainly did intend to prevent the law making power from enlarging or lessening the terms and benefits the citizens might at any time secure to themselves by contracts which were lawful at the time they were made.

In the case before the court, I think it has been shewn, that by this marriage the wife contracted and gave to the husband her person and fortune, subject to the action of the law of the land as it then stood. It is a fixed rule in law, that the law relating to a contract is as much a part of the agreement, as if it were expressed by the parties. If this is true, then the contract was, that the husband should have all the personal property of the wife, both in possession and action, subject to this condition, that as to that portion of the personality not reduced to possession, during coverture, it should go to the personal representatives of the wife, or to herself in case she survived the husband, and that as to the real estate of the wife, the husband should be tenant for life of them, in case issue capable of inheriting to the wife, is born alive. Are these advantages and benefits not worth securing to the citizens by constitutional guaranty, as much as any others that relate to property?

Again let us look at the case of the wife—she contracts for a protection—for a maintenance suitable to her degree and to his fortune—for the third part, or the half of his personal estate, in case of issue or not,—for maintenance and education of her children,—for the third part of his real estate, for her life, in case she survives him,—and above all, for a faithful friend and companion and adviser through life. Yet it is argued that these benefits contracted for, and arising out of the contract of marriage on both sides, are not within the restriction that the obligation of contracts shall not be impaired. That they were not thought of, by the convention;—but if they were thought of, they were deemed inferior to the benefits arising out of a contract to dig a ditch or a well. I cannot believe it—I think this contract together with all its

AUG. TERM
1835.

The State
v.
Fry & others.

advantages were intended to be, and in reality are pro-
tected by the prohibition. The next enquiry is, does the
act of the general assembly in question impair the obliga-
tion of the contract, between Gentry and wife. The act
simply divorces the wife from the bonds of matrimony
contracted with her husband. No cause is assigned, nor
is the legislature bound to assign a cause, for the pro-
duction of any law. I must take the case to be that there
was a legal cause for the divorce, or that there was no le-
gal cause. What I mean by a cause of divorce is this:
That when the contract was made, whatever the law
then existing had declared to be a breach of the contract
and cause of divorce is legal cause. Such as adultery,
cruel treatment, wilful desertion &c.—which have been
long declared to be causes of divorce when application is
made to the courts. Or at all events the act which is
made cause of divorce should have been declared to be
cause of divorce by the public law of the land, before the
particular act complained of was committed—otherwise
the action of the legislature would be retrospective in its
operation and would be within that prohibition contained
in the same 17th sect., above referred to, which says, no
retrospective law can be passed.

What I mean by a divorce being granted without legal
cause, is where the divorce is granted without such legal
cause as above pointed out. But yet the reason for
granting the divorce depends on the existence of some
fact or act done which in the opinion of the legislature
makes it unjust, or inconvenient to the parties that they
should live together any longer. I will first examine this
question on the ground that the divorce was granted on
the latter ground, that is, the legislature were of opinion
it was unjust to the woman or inconvenient to her, or if
you please, inexpedient in a public point of view, that she
should any longer be bound to Gentry, by reason of her
solemn marriage engagement. In this case I have shewn
there existed a contract which fairly is embraced, as a
contract within the prohibition, and the legislature of the
country have thought and so enacted that the parties
are not bound any longer to perform the agreement. I
must now enquire, what it is to impair the obligation of a
contract. We have seen in the beginning, what a con-
tract is. Now wherein consists its obligation. On this
point we are not without some light. In the case of
Sturgis v. Crowningshield 4 Wheaton's reports 122, deci-
ded by the supreme court of the United States, the court
declared what is the obligation of a contract, and what
impairs it.

The case there decided was a case where the legislature of New York had passed an insolvent law, by which the debt as well as the debtor might be discharged. The court decided the law unconstitutional, because it released, it impaired the obligation of the contract. The same provision is contained in the constitution of the United States that is, in our constitution, only with this difference—in that, the states are forbidden to pass laws impairing the obligation of contracts—our constitution, forbids our legislature. In page 179, Chief Justice Marshall says, a contract is an agreement to do or not to do a particular thing, the law binds him to perform his promise, this is of course the obligation of the contract. And again, in the same case p. 179, the court declare, that any law that releases any part of the obligation in the literal sense of the word impairs it. The case above cited of Sturgis v. Crowningshield is much like the case at bar.

That was a case where a debt was created by a promise of the party. The legislature of New York entirely released the debt, and abolished the contract. In this case the duties and rights were created by a promise, and the legislature have totally annulled the contract. In the year 1822, this court, in the case of Baily v. Gentry and wife, decided the same point as to what impairs the obligation of a contract. That was a case where Baily owed a debt by contract, judgment was rendered against him, the legislature passed a law, declaring that in all such cases, if the creditor would not take property at two thirds of its appraised value, he should be postponed two and one half years. The court declared the act of the general assembly to be void, because it impaired the obligation of contracts.—2 vol. Missouri Rep. 164. That decision has been made about twelve years, and the doctrines therein contained, have not yet been disputed by any one as far as I know.

This divorce, as I now view it, was granted for some cause not known to the law at the time the promise was made, or not declared by public law to be cause of divorce at the time the act was done,—has totally annulled the contract. If the act of Gentry for which the divorce was granted was not a cause of divorce, so made by the public law of the land, before the act was done, then the law, which afterwards made it cause of divorce, is retrospective and is against that prohibition in the 17, sect. of the 13th art. of the constitution which says, no retrospective law can be passed. A retrospective law simply means a law looking back to some act already done, and

then for the first time declaring that the act already past should now for the first time be deemed wrong. If this divorce was granted for any such cause, it would impair the obligation of the marriage contract and be retrospective, and of course unconstitutional and void. But in as much as I cannot see from the act itself what the cause of divorce was, I must examine all the grounds on which it could have been granted, and if any constitutional ground is found to exist, the divorce must stand. There are, and were at the time this divorce was granted, six causes of divorce from the bonds of matrimony. 1. If either was impotent at the time of the marriage and still is so. 2. If either party had a husband or wife still living at the time of the second marriage. 3. If either party commit adultery. 4. Wilful desertion without cause for two years, and by the act of 1833, cruel treatment, and conviction of an infamous crime. In all these cases, the application is to be made to the circuit court, and if found against the party complained of, the court shall pronounce a decree dissolving the bonds of matrimony. If this divorce were granted for all or any one of these causes, then the question arises, whether the legislature have not exercised a power, which does not belong to them; a power which they are forbidden to exercise by the second article of the constitution. That article declares, that the powers of the government, shall be divided into three distinct departments, each of which shall be confided to a separate magistracy, and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted. I presume there is no question more clear than this, that if the power to grant divorces is a judicial power, then the legislature cannot do it. The 1. sect. of the 3. art. of the constitution declares that the legislative power of the state, shall be vested in a general assembly, which shall consist of a senate and house of representatives, to be chosen by the people. The constitution then goes on to prescribe many of the duties and powers of the general assembly, in special cases. A judicial power is no where given to them.— But judicial power is given to the senate in cases of impeachment—also a sort of judicial power is given to both houses to remove a judge by address.—The 4. article vests the supreme executive power in a governor, who is to be chosen by the people. No judicial, nor legislative power is any where given to him, except a qualified veto

on the acts of the general assembly. The fifth article vests the judicial power, as to matters of law and equity, in a supreme court, circuit courts, and such inferior tribunals, as shall from time to time, be established by the general assembly. Neither legislative, nor executive power is, in any instance, given to any of the courts, except the appointment of clerks may be considered rather of the executive kind.

The question now arises, to which of these three departments does the duty and authority of granting a divorce belong. The court have no more power to enforce an unconstitutional law, than the legislature has to make it. Both are equally required by the constitution, to take a solemn oath to support the constitution. I should suppose the legislature have discharged their obligation to this oath, when they take care not to pass any law, nor do any act as legislators, which in their best judgment, is against the words and spirit of the instrument. I suppose also the judges of the respective courts regard the constitution as the supreme and paramount law of the land, and regard every law and act of the general assembly and all others, which are contrary to this supreme law, as void and of no force. This they can only do, according to their best judgment and belief. If this is not their duty under their oath, then what shall be their duty? When a court decide a law unconstitutional, they only say the party, who claims a benefit under such law has no right, at least none which they can enforce, for the simple reason that no one can have any right, benefit, or exemption, which the constitution of the state forbids him to have; no matter by whom this right is attempted to be given. When a person is possessed of a right or benefit, which the public law of the land authorizes him to possess, no power in the government can take that right, nor any portion of it from him, without some fault committed or wrong done by him, which acts must have been before they were committed, declared to be faults and wrongs by public law; otherwise a law declaring them to be so, and fixing consequences which did not exist before, would be retrospective. The courts have no more lawful power to enforce unconstitutional acts, than the legislature have to make them. But if they should by mistake do so, there could be no relief, in that particular case.

This is a defect in human institutions, for which no adequate remedy has yet been devised.

To dispose of the question now before us, I must enquire, whether the act of decreeing the bonds of matri-

mony void, because one of the parties has broken his contract, and forfeited all right to claim of the other any further performance, is a legislative or judicial act.

When the convention which formed the constitution vested all legislative power in the general assembly, they had some tolerably definite idea, in their minds, what they intended should be understood by legislative power, and so of judicial power. But as they have not told us what they did mean by legislative power, and what by judicial and executive power, I must resort to such dictionaries written in the English language as may tell us what the common and usual meaning is, of these words legislative and judicial.—I must also resort to the constitution itself wherever it throws any light on the subject; to the acts and expressions of the general assembly in their public statutes, to the common law of the state and to the opinions of men learned in the law and language of the country. If there are any other means than these, to solve the present questions, as well as to solve the questions what is meant by the constitution, when it speaks of treason and levying war against the state—and when it speaks of capital punishment, the privileges of the writ of *habeas corpus* &c., I am ignorant of them.

Our first point is, what is legislative power? It hardly can be necessary to give much authority as to the meaning of legislative power. Lexicographers define legislative to be, giving laws and law giving. The legislative power then, is that power in a state which gives and makes laws for the people, and the law in a state is defined to be, those rules which are ordained and made known by the legislature, for the government of the people in the state, which they are bound to obey.—1 Blackstone's commentaries 44.

He likewise says, it is a rule of civil conduct. Law is, says he, a rule, not a transient order from a superior, to or concerning a particular person or thing, but something permanent, uniform and universal. Therefore a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a law—for the operation of this act, is spent on Titius only, and has no relation to the community in general.

It is rather a sentence than a law. But an act to declare the crime of which Titius is accused shall be deemed high treason, this has permanency, uniformity and universality, and therefore is properly a rule, a law.

In Jacob's law dictionary, law is thus defined:—It is the

rule and bond of men's actions; or it is a rule for the well government of a civil society, to give to every man that which doth belong to him.—See Jacobs tit. law.—Rutherford a writer on natural law, defines law to be, as applicable to the actions of men, a rule to which men are obliged to make their actions conformable.—1. vol. Institutes of Natural law, p. 15. Judge Kent of New York, an acknowledged able writer, on the law of New York and law generally defines law to be "a rule of civil conduct prescribed by the supreme power in a state."

It is supposed these authorities are entirely sufficient to shew what is meant by law. To exercise the law making power, must mean to make rules for the government of men's actions, and to make rules to define what shall be yours and what shall be mine, to make rules declaring what shall be the consequence of doing and not doing particular acts. If these things do not form the sum and substance of legislative duties, let those who have more light on that subject, than I have, give that light. These laws which the legislature are authorized to make, must be free from several objections. They must not be *ex post facto,* nor can they be retrospective. They must not impair the obligation of contracts &c. No power in the state, as its government now stands, can make or enforce any law which impairs the obligations of a contract. But in this case it is supposed Gentry has broken his contract, by refusing to do that which it required, or doing that which his contract forbid, and that which the law forbid. Here then is a case of a contract broken, the injury done is to the wife—and by the law, as it stood at the time, is legal cause of divorce. The injury must have been to her happiness, her person, property or character, all these injuries, which the statute respecting divorces and alimony has made causes of divorce, respect the person and happiness of the woman.

The statute law of the state, declares these things, whenever they are ascertained by the circuit court to exist, to be a forfeiture on the part of the guilty, of all his or her rights to future and farther performance—and to be a release of the innocent party. Now, whose business is it to enforce this forfeiture and redress the wrong? The 7th section of our bill of rights, has declared, that courts of justice ought to be open to every person, and certain remedy afforded for every injury to person, property, or character, and that right and justice ought to be administered without sale &c.

It appears to me that this declaration of the convention

amounts to a strong command and direction to the courts, to entertain, hear and determine all manner of complaint for injuries done to persons, property and character. · Is the granting a divorce, a fit subject for judicial action? The general assembly have expressly made it so, by the act respecting divorces, R. C. 328, and that they have properly made it so, I think is clear from the above 7th section of the bill of rights. If I am not mistaken in this argument and view, the inevitable result is, that the legislative department of the government cannot grant a divorce, because that involves a question of injury to person, property, or character,—that the judicial power is expressly charged with this, and that the legislature are expressly forbidden, to exercise any power that properly belongs to another department. And again, it seems to me, that this subject, from its very nature, is judicial.— Judicature is defined to be a court, or rather a power which distributes justice. A judicial power can mean nothing more nor less than the power which administers justice to the people, according to the prescribed forms of law,—according to their rights as fixed by the law. It will be easily seen that there is a clear distinction between making a law and pronouncing a sentence, in a case brought before a court, that the party who is injured shall have the satisfaction, relief, or damages which the law has previously fixed. Whatever power in a state renders judgments, sentences and decrees, between parties, fixing the damages, compensation and relief, which the injured party shall have of the aggressor, for the injury, is called the judicial power, no matter whether that injury has arisen out of, or because one of the parties has broken his contract with the other, or beat him, taken unlawfully his property, slandered his character, trespassed on his lands, or been guilty of deceit and fraud. This power is bound to give its judgments according to the laws previously enacted by the legislature, it can make none, nor enforce any which are contrary to the constitution.

I feel confident the above view is in substance, about the view which the convention had of judicial power when they made the constitution. The 5th article and 1st sect., declares, the judicial power as to matters of law and equity shall be vested in a supreme court, circuit courts &c.

This provision I think clearly shews, especially when taken in connexion with the 7th sect. of the bill of rights, what is meant by matters of law and equity—which pro-

vision has heretofore been cited, which declares that for all injuries to person, property &c., courts ought to be always open and afford a certain remedy. This provision in the 5th art. takes all adjudication of private rights away from the general assembly. The 6th sect. of the 5th art., provides that the circuit court shall have exclusive original jurisdiction in all civil cases not made cognizable by justices of the peace.

This provision, if it mean any thing, at all, must mean such cases as are proper subjects for judicial action. It seems to me to follow conclusively from this that as long, at any rate, as the circuit courts are charged with the exercise of the power of granting divorces from the bonds of matrimony, the legislature cannot do it, consistently with the provision in the second article of the constitution. Another view of this subject is, that the 8th sect. of the bill of rights is violated by the exercise of this power on the part of the legislature. It declares the trial by jury shall remain inviolate. I take it for granted, these words were intended to have some agency in securing to the citizens their rights. It is generally understood and agreed, that these words were intended to mean, that the trial by jury should remain as it existed in substance, in the country at the time the constitution was adopted.

The right as it then existed in the country was that in all cases in courts of law when the matter in dispute was of the value of twenty dollars, either party and both parties had a right to have every fact involved, in case that was denied, tried by twelve impartial men; that he had a right to demand that no judgment on any fact should be given against him, without this trial. If this is correct how can this take place in the general assembly?—all will admit that it cannot, and in this case has not been had; yet the plantiff has been stripped of valuable rights.

The defendants counsel have argued, that this power has been and is yet exercised, by nearly all the state legislatures in the Union. It is granted that this is so—yet it is believed that none of those states whose legislatures exercise the power, have that provision in their constitutions, which is found in the second art. of ours, respecting the division of the powers of the government. I cannot find that the exercise of the power, by the legislatures, has been at any time questioned in any of the state courts.

This proves that the doctrine has been acquiesced in, and not that the courts would have sustained the doctrine,

AUG. TERM 1835.

The State v. Fry & others.

if the question had been raised. It is no less strange that this question should now be solemnly raised for the first time in Missouri, than it is strange that questions respecting bills of credit being issued by a state, should have remained unraised in the several states, from the time of the adoption of the federal constitution in 1789, till the year 1824, when it was first raised in Missouri; and there are no doubt yet many important questions on constitutional law, reserved for the successors of the present judges belonging to the U. S. and the state courts.

Another point of view in which this question has been urged before this court, by the defendants' counsel is that this principle of granting legislative divorces, practised on by the territorial government, in many cases, and since then by the state legislature, in many more, and now to declare these divorces void will surround the parties and their rights, in mischiefs greater than a continuance of the practice, would or could do to the country. I know many difficulties will arise out of the decision which I feel obliged to make. In many instances the parties have married again, acquired new relations and responsibilities. One answer to this argument should be, the courts are bound to do their duty under the law and the constitution—and should say as Lord Mansfield said in the case of the King v. Wilkes—"*Fiat Justitia ruat cœlum.*" Besides that, as to whatever matters of expediency there may be in the nature of the case, the constitution has not entrusted those matters to the courts; but they are entrusted to the governor in some cases, and to the legislature in others, under the restrictions in the constitution itself. But again, I see no reason why this act will not operate as it declares it shall act, so as to free the parties from the pains and penalties for a second marriage. I see no reason why the legislature may not make the children of the second marriage capable of inheriting to whomsoever they choose in case of intestacy. But the rights acquired in the way of property are beyond their constitutional power.—It has been said that for aught we know Gentry may have consented to the dissolution of this contract;—as to that the answer is that those who claim the benefit of such consent must shew it, which has not been done. It is very probable, that when both parties consent, as they might perhaps in cases of divorce, the legislature would be competent to authorize the parties to live separate and even to marry again, without incurring the penalties for bigamy—but the rights of property fixed and vested by the marriage would it seems to me, still remain fixed and vested.

To prove the legislatures of the states have the power to grant divorces, Hoffman's legal outlines have been cited, and also the opinions of justices Marshall and Story, in the case of Dartmouth college v. Woodward, 4 Wh. 538. Mr. Hoffman appears to be a good writer, if not correct. He wrote his lectures for the use of the students of the University of Maryland.—1 vol. 150 has been cited, this throws no great light on the subject,— there he treats of the subject of divorce and holds marriage is of perpetual obligation.

P. 372, has also been cited—the doctrine there laid down relates to the definition of law—he gives in some respects a better definition of law than Blackstone. With regard to the opinion of justice Marshall in the case of the Dartmouth college, he says, he is of opinion that the prohibition in the constitution of the United States which prohibits the states from passing laws to impair the obligation, was not intended to prohibit the states from passing general laws enabling some tribunal to declare the forfeiture in cases of marriages where one of the parties has failed to observe the stipulations on his part. This he says is often the means of enforcing the contract rather than impairing its obligation. But says he, when a state shall pass a general law annulling all marriage contracts without the consent of the other, and without any fault on his part, it will be time enough to consider that question. What is here said was said by way of argument, and was not involved in the case. But I think the argument correct.

It is the business of the legislature of the states to declare *a priori*, what shall be the consequences of breaches of all contracts, and to establish proper tribunals to enforce those consequences. This is exactly what I insist upon. But in this state, at any rate, that business must be referred to the proper department, which is that of the judiciary.

Judge Story's opinion is strongly against the power of the legislature passing laws to divorce persons without the consent of the parties, and recognizes the propriety of making laws to enforce the consequences of a forfeiture. Upon the whole of this case the judgment of the circuit court is reversed,—that court is directed to sustain the demurrer to the defendant's plea, and to proceed with the cause.

Tompkins J.—Is the act of the legislature divorcing Gentry and wife, an exercise of power properly belonging to the judicial department?

25

AUG. TERM
1835.

The State
v.
Fry & others.

unconstitutional,
—and the plea
bad.

The second article of our state constitution, divides the powers of government into three distinct departments, each of which is confided to a separate magistracy; and by the said article, it is provided that no person charged with powers properly belonging to one of those departments, shall exercise any powers properly belonging to either of the others, except &c.; and it is not contended that this is an excepted case. To ascertain whether the character of the act be legislative or judicial, I will first enquire what a law is. A municipal law (for that is now the object of inquiry) is a rule of civil conduct, prescribed by the supreme power in a state.—See 1. Bl. com.

Law, continues the same author, is a rule, not a transient sudden order to, or concerning a particular person; but something perminent, uniform and universal. Therefore a particular act of the legislature to confiscate the goods of Titius, or attaint him of high treason, does not enter into the idea of a municipal law, for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law. But an act to declare, that the crime of which Titius is accused shall be deemed high treason,—this has permanency, uniformity and universality, and therefore is properly a rule. I will not suppose that any lawyer or well informed man, would desire a more correct definition of a law, than that given above, or any better authority than that of the learned author above cited.

Gentry by his marriage with this woman, had acquired certain rights, of which, by this act of the assembly he is deprived. Is it not an act then, the operation of which, is spent on Gentry and wife only,—is it not one that has no relation to the community in general—is it not one that has no permanency, uniformity or universality? And I will not, in the language of Blackstone, ask if it be not rather a sentence than a law; but I ask if it is not in the fullest sense, a sentence, a decree or a judgment. If an act had been passed, declaring that the facts charged against Gentry (and no doubt some were charged against him, although none appear in the act) should be *deemed* good cause for decreeing a divorce, this according to the above definition, would have been a law. But who can doubt that the act divorcing Gentry and wife, is one, the operation of which is spent on them only, one which has no relation to the community in general, and consequently a sentence, a decree, a judgment of law on the facts charged. But it is contended that many of the legislative

bodies of the states composing this Union, not claiming the omnipotency of a British Parliament, but whose powers are limited by provisions as strict as those contained in our own constitution, have passed acts of divorce. In all this I see nothing more than the mere volunteer opinions of men, three fourths of whom, it may be fairly presumed, had no pretensions to be called lawyers,—opinions too declared in general, without hearing the arguments of counsel interested in procuring a rejection of the petition for the divorce. Such authority is so slight, that in my opinion it weighs almost nothing. Let us then advert to what our own legislature has from time to time declared on this subject. In the year 1825, they re-enacted the Territorial law by which the courts were directed to grant divorces for causes therein enumerated. In 1833, they passed another law, in amendment of that last above mentioned. This power, thus conferred on the courts, had it properly belonged to the legislative department, they were prohibited by the second article of the constitution from delegating to the judicial department. But our legislatures have also, in numerous instances, granted divorces, sometimes for causes set out in the act, and sometimes no cause being set out; and we are warned in the most solemn manner, of the respectful deference due to the legislative department; and we are very properly required to decide, if we entertain a reasonable doubt on the subject, that the act of divorce is valid. A respectful submission to the laws, and a respectful deference to the law making-power, are so essential to the well being of society, that no good citizen ought ever to be tired of hearing their importance urged upon his attention; and by the peculiarly happy organization of our government, judges have more reasons than the rest of the community, to show this submission and deference. This is a matter so well known to those who have even a slight knowledge of our laws and constitution, that one would think there could not be quite so much danger of a judicial usurpation of legislative power, as some good people seem to apprehend. But as judges have more reason than the other members of the community, to hold in respect the laws, and law-making power, so also they have more reason to act with firmness and decision when the question before them is, whether an act of the legislature be constitutional. For if one of their acts be unconstitutional it is void, and the judge, who on a proper occasion fails to decide it to be so, disregards his oath of office, and deserves to be ignominious-

ly chased from the bench, even by the same men who passed the unconstitutional act. Disregarding consequences then, and aiming only to discharge the duty imposed on me by the constitution and laws of the land, I will proceed to examine some of the acts of the legislature and from them endeavor to ascertain what opinion that body itself appears to have entertained of the character of the power of granting divorces.

The act of 1825 declares, that where a marriage hath been heretofore, or shall hereafter be contracted and celebrated between any two persons, and it shall be adjudged in the manner hereinafter mentioned, that either party at the time of the contract was and still is &c. (here the causes of divorce are set out,) it shall and may be lawful for the innocent and injured person to obtain a divorce &c. Here we see that before a divorce can be obtained, an enquiry must be made into the truth of certain charges against the defendant, it must also appear that the petitioner is innocent and injured, and furthermore an adjudication, in the language of the act, must be made. The act of 1833, speaks a language, which demonstrates in terms equally plain, that the legislature viewed the power of granting divorces, in that and the preceding acts conferred on the courts as of a character purely judicial. In most of the acts passed to divorce parties, it appears on their face, that the legislature, in the first place, saw charges preferred, then heard testimony, and then determined to grant the divorce. What is this but sitting in judgment and determining causes like a court of law? It is not however to be presumed, that the legislature was so unjust as to grant a divorce in any case without hearing the party, if he desired it, against whom the petition was preferred. The fifth section of the act of 1833, above cited, contains a provision that thenceforth no divorce shall be granted by the general assembly, unless the person applying for the same shall have notified the opposite party of the intention to apply to the general assembly for such divorce, and in all cases the applicant must notify the opposite party of the grounds on which such application is to be made. In every court there must be at least three constituent parts—the actor, reus and judex. The actor or plaintiff who complains of the injury done, the reus or defendant who is called upon to make satisfaction for it, and the judex or judicial power, which is to examine the truth of the fact, to determine the law arising upon that fact, and, if any injury is done, to ascertain, and by its officers apply the remedy. See 3

AUG. TERM
1835.

The State
v.
Fry & others.

.Bl. com. p. 25. In the application to the legislature for this divorce, Gentry's wife the petitioner is actor or plaintiff, who would now by the 5th section of the act of 1833 above cited, be required to notify him of the intention to apply to the legislature for the divorce and also of the grounds on which it is demanded. Gentry is the reus or defendant who is called upon to make satisfaction, that is to submit to be divorced and thereby to lose all the rights which he had acquired by the marriage, and the legislature is the judex or judicial power to determine the law arising upon the fact, that is to determine whether on the facts proved, the wife should be divorced from the bonds of matrimony by her contracted with her husband. Is not this as much the exercise of judicial power, as to decide with all the solemnities of a court of law to which of two men a tract of land belongs? If the character of the act of granting divorces could be doubted, the legislature has itself determined it to be judicial by the provision made in the fifth section of the act of 1833, above cited, requiring the petitioner to notify the opposite party of the intention to apply and of the grounds of application. That is to summon him to appear as in a court of justice and show cause, if any he can, why judgment of divorce should not be pronounced against him.—But the counsel of Fry contend, that this contract of marriage is a peculiar kind of contract, not governed by the laws of the place where it may have been made, should the parties migrate to a strange land. If two persons for example, marry in France and afterwards become domiciliated in Missouri where one of them dies, the property belonging to them would be disposed of according to the laws of Missouri and not according to those of France, where the marriage had been contracted, and whose laws, it is contended were a part of the marriage contract. Thence it is concluded that marriage is rather a relation than a contract.

This conclusion seems to me to be the result of a confusion of ideas. The laws of a country where a marriage is contracted form no part of the contract of marriage. By a contract always implied between the government and the community, each member agrees to submit to laws made for the whole, and the husband and wife are as much bound by this implied contract as each individual is. If they elect to abandon France their native country and to take up their residence in Missouri, they thereby enter into an implied contract with the state of Missouri, that the property left undisposed of on the

death of one of the parties shall be disposed of agreeably to the general law of the land. It would be as unreasonable for such persons to intɪoduce the laws of France here to regulate the descent and distribution of their property, as for a native of France, who had abandoned his country at the age of maturity, whea the implied contract between him and his native country was in full vigor, to bring along with him the laws of France to be tried under, if it should ever so happen that he committed murder within the jurisdiction of Missouri. The argument derived from the indissolubility of the marriage contract by the mere act of the parties has as little weight in it.

Who does not see in it a mere municipal regulation absolutely necessary for the maintenance of decency and good order? But grant that marriage (in the words used by the counsel of Fry) and as they seem to contend, is no contract: it is equally true that it is no relation. The second species of contracts according to Sir William Blackstone's arrangement is Facio ut Facias, as if I agree to do a man's work for him, if he will do mine for me, or if two people agree to marry together. It is as inaccurate to say that marrying or marriage is the contract, as to say that doing the work is the contract. The agreement to do the work of each other is the contract in the one case, as the agreement to marry is in the other; and the relation subsists betwixt the two contracting parties made man and wife by the marriage. So that the whole argument based upon the idea of marriage being a relation &c. appears to be (as often happens in learned controversies) a mere play upon words, or at best an inaccurate use of terms. We have seen that law is a rule of civil conduct, not a transient sudden order, to or concerning a particular person; but something permanent, uniform and universal; whereas the act of the geneɪal assembly, divorcing Gentry and wife, is one, the operation of which is spent on Gentry and wife only, and has no relation to the community in general. I am of opinion, then, that it is an exercise of power properly belonging to the judicial department.

In this opinion I am confirmed by the course pursued by the legislature itself, first in conferring on the courts by the acts of 1825, and of 1833, the power of granting divorces for causes in such acts enumerated, a power which had it been legislative they were prohibited by the second article of the constitution from delegating to the judicial department, secondly, because it appears from the face of many of the acts passed by the legislature to

divorce man and wife, that that body manifested its own opinion of the judicial character of the power of granting divorces by hearing testimony, and, on such testimony so heard, deciding upon the merits of the application for the divorce; and lastly because in the 5th section of the act of 1833, above cited, the same body did in more plain terms indicate its opinion of the judicial character of the said power of granting divorces, by requiring the petitioner in future cases, to give notice to the person complained against, of the intention to apply to the legislature for the divorce, and also of the grounds on which such application will be made. Such being my opinion it is useless to pursue the enquiry further. For the reasons above given, the plea of the defendant, in my opinion, is bad, and the demurrer to it should have been sustained: The circuit court then, in overruling the demurrer has, as it seems to me, committed error, and its judgment for such error ought to be reversed.